### In re BLUE COAL CORPORATION, Debtor.

### In re GLEN NAN, INC., Debtor.

### Bankruptcy Nos. 76–1311, 78–604.

United States Bankruptcy Court, M.D. Pennsylvania.

Dec. 4, 1986.

John H. Doran, Doran, Nowalis & Flannagan, Wilkes-Barre, Pa., Atty. for Trustee.

Joseph A. Dworetzky, Drinker, Biddle & Reath, Philadelphia, Pa., Atty. for G.A. Resources.

Joseph Solfanelli, Gerald Butler, Solfannelli & Butler, Scranton, Pa., Atty. for McClellan Realty.

### MEMORANDUM AND ORDER

THOMAS C. GIBBONS, Bankruptcy Judge:

The relevant facts underlying the controversy in the liquidation of the Debtors herein are not in serious dispute. Both proceedings have been in administration for an unusually long time with Blue Coal Corporation now approaching its 11th year. They have been marked by constant and sometimes lengthy litigation.

James T. Haggerty, Esq. (Trustee) filed a Motion on August 12, 1986, seeking authority to entertain an Agreement of Sale with G.A. Resources (GAR). Simultaneously, a Complaint was filed against a number of defendants praying for an order permitting him to sell the assets in the Agreement of Sale to G.A. Resources, free and clear of all liens, claims and encumbrances.

The proposed findings relating to procedure and jurisdiction submitted jointly by the Trustee and G.A. Resources correspond

to the docket entries in this matter and are hereinafter set forth:

1. On August 12, 1986 the Trustee filed a Motion for Authority to Execute Agreement of Sale and to Assume and Assign Executory Contracts (the "Trustee's Motion").

2. On the same date the Trustee filed a Complaint to sell Property Free and Clear of Liens (the "Trustee's Complaint").

3. Notice of the Trustee's Motion (the "Notice") was sent to all creditors and parties in interest of Blue Coal and Glen Nan. The Notice provided that a hearing concerning the Trustee's Motion would be held on September 18, 1986 and provided that any party desiring to oppose the relief sought by the Trustee in the Motion was required to file an answer or objection on or before September 11, 1986.

4. On August 13, 1986, the Clerk of the United States Bankruptcy Court for the Middle District of Pennsylvania issued a Summons and Notice of Pre-Trial Conference (the "Summons") which was served by the Trustee's counsel with a copy of the Trustee's Complaint by mail on the 48 named defendants.

5. The Summons provided that defendants were required to serve their answers to the Trustee's Complaint on or before September 12, 1986, and file their answers on or before September 16, 1986. The Summons further provided that in the absence of an answer, judgment by default would be entered against the non-answering defendants.

6. Objections to the Trustee's Motion were filed by McClellan Realty Corporation ("MRC"), the Commonwealth of Pennsylvania (the "Commonwealth"), the United States of America (the "United States"), and Robert W. Cleveland and Sons, Inc., William T. Karchoff, Jay W. Cleveland, and the estate of Roy L.E. Cleveland (collectively, the "Cleveland Group").

7. Non-consenting answers to the Trustee's Complaint were filed by MRC, the United States, and the Commonwealth.

8. The Motion and the Complaint taken together seek the Court's approval of the sale of all the assets of Blue Coal and Glen Nan to GAR, pursuant to the terms of a proposed agreement of sale (the "Agreement of Sale") attached to the Trustee's Motion.

9. Pursuant to the custom of this Court, the Notice provided that competing bids to the GAR bid would be received at the hearing on the Trustee's Motion set for September 18.

10. The Notice further provided that the Trustee would recommend that the Court approve a competing bid only if it satisfied four conditions. The conditions were that the competing bidder (a) proposed to purchase the assets on the same terms and conditions as set forth in the proposed Agreement of Sale; (b) proposed a purchase price at least 5% in excess of the purchase price proposed by GAR; (c) provided the Trustee three days prior to September 18 with evidence of the bidder's ability to provide a $1,000,000 letter of credit upon approval of its bid; and (d) satisfied the Trustee that the bidder was acting in good faith.

11. The Notice further provided that the Bankruptcy Court might entertain bids not in compliance with the Trustee's conditions but noted that the Trustee would recommend any bid not in compliance be rejected.

12. On September 18, 1986, the Court held a pretrial conference in connection with the Trustee's Complaint. At the same time the Court met with counsel for the Trustee, GAR, and the objecting parties and established a procedure for the resolution of objections to the Trustee's Motion. Pursuant to agreement of counsel the Court entered Procedural Order # 1 dated September 18, 1986, continuing the trial on the Trustee's Complaint and the hearing on the Trustee's Motion to a consolidated proceeding to be held on October 20, 1986. Under Procedural Order # 1 an abbreviated discovery schedule was set so that the parties would be in a position to proceed on the merits on October 20, 1986.

13. No competing bids to the GAR bid were presented to the Court on September 18, 1986. A notice of intention to bid had been filed prior to September 18 by Mountain Shore Development Corporation, Inc., but its counsel appeared on September 18 and advised the Court that Mountain Shore was not prepared to make a bid, either in compliance with the Trustee's conditions or otherwise. Mountain Shore requested, however, that the Court permit it an opportunity to tender a bid at any time on or before October 20, 1986. This request was opposed by the Trustee and GAR.

14. A hearing on Mountain Shore's request was held on September 29 at which time testimony was then taken. Mountain Shore informed the court prior to the October 20 hearing that it decided not to bid.

15. The Trustee and the objecting parties engaged in substantial discovery, including depositions, interrogatories, and production of documents, during the period between September 18 and October 20.

## DISCUSSION

Although objections to the Trustee's Motion were filed by various entities as set forth in Paragraph 6 hereinabove and nonconsenting answers were filed to the Trustee's Complaint as set forth in Paragraph 7, at the time of trial only "MRC" appeared to pursue the positions outlined in those documents. A joint evidentiary hearing was held on both the Motion and the Answer filed by "MRC". At the conclusion of that hearing it was evident that "MRC", in reality, predicated its opposition to the Trustee's action on the reasons assigned in its objections to the Trustee's Motion. They are as follows:

1. McClellan Realty Corporation is the holder of mortgage claims against the Bankrupt Estates, which have been subordinated to the claims of other creditors by an order and judgment dated March 26, 1985 of the United States District Court for the Middle District of Pennsylvania. The order and judgment have been appealed to the United States Court of Appeals for the Third Circuit, and a decision is pending.

2. McClellan Realty Corporation objects to the court's approval of the Trustee's Motion for Authority to Execute the proposed Agreement of Sale and to Assume and Assign Executory Contracts for these reasons:

(a) The proposed purchase price is inadequate in view of prior appraisals, and is insufficient to pay all lien claims against the Estates;

(b) The proposed sale of such concentrated resources should be advertised world-wide to obtain the maximum price possible;

(c) The assets should be offered for sale in parcels and in bulk to obtain the maximum return to the Estates; and

(d) The proposed Agreement of Sale at less than prior appraised value should not be approved without current appraisal.

These will be considered separately:

1. Since the trial of this matter a decision of the Third Circuit Court of Appeals dealing, *inter alia*, with the validity of the mortgage lien of "MRC" upheld the ruling of the District Court virtually in all respects, but overruled that portion of it which failed to invalidate the mortgage lien of "MRC" completely. Consequently, it appears at this stage at least that "McClellan possesses no rights as a creditor with respect to the putative assignment of the IIT mortgages." (*U.S. v. Tabor Corp.*, 803 F.2d 1288, 1307 3rd Cir.1986).

"2(a). **The proposed purchase price is inadequate in view of prior appraisals, and is insufficient to pay all lien claims against the Estates;"**

■ It is noted that the objector "MRC" has offered no affirmative testimony whatever to support this allegation. We are left then with the proof offered by the Trustee:

1. The Purchase Price is to be paid by GAR's delivery to the Trustee, immediately following approval of the Trustee's Motion, of an irrevocable letter of credit in the amount of $1,000,000, and the delivery to

the Trustee of $20,000,000 in cash at Closing. Tr. 46, P–1, P–11.

2. The Purchase Price is subject to adjustment in certain circumstances, including the circumstance that the Trustee is unable to deliver clear title to property included in the Assets or in the event that the property contains hazardous or other waste. P–1.

3. While not an exhaustive list, the Assets include five major categories of property: (i) cash and cash equivalents in the amount of approximately $2,200,000; (ii) intangible personal property including choses in action, good will, trademarks, etc; (iii) personal property including machinery and equipment; (iv) mineral rights and lands; and (v) non-coal real estate. Tr. 28, 151, P–1.

4. The Trustee believes that the proposed $21,000,000 purchase price for the assets is fair and reasonable and represents the highest value reasonably available to the estates. Tr. 43, 45.

5. The Trustee offered expert testimony to support his analysis of the Agreement of Sale. This testimony described the methodology that a prudent investor would use in valuing the real property and mineral rights. Trustee's expert witness testified that the prudent investor would begin by aggregating the fair market "price" of all individual parcels of land and all coal royalties derived from or capable of commercially feasible extraction. The aggregate fair market price of the real estate is approximately $16,000,000. The aggregate fair market price of the coal royalties is approximately $30,875,000. Tr. at 135, 164.

6. A prudent investor would recognize that fair market price is not the fair market *value* of the assets, because the aggregate market price does not reflect the period of time necessary to liquidate the Assets at the fair market price and assumes that there is a ready, willing, and able purchaser for each parcel of land and for all of the mineral rights. The aggregate fair market price also does not reflect the costs of sale of the Assets, the cost of holding the Assets until sale, nor the application of an appropriate discount rate to reflect the alternative uses of investment capital and the risks inherent in a transaction of this size and complexity. Tr. 128, 136–137.

7. In order to reduce the aggregate fair market price for the real estate to a fair market value, a prudent investor would project an orderly liquidation of the real estate spanning a period of at least ten years and would anticipate paying sales commission, bonuses, marketing expenses, and costs of conveyancing of 12% of the total real estate sold in any given year. A prudent investor would assume that holding costs would be approximately 2.5% of the value of all remaining property held in the portfolio at the beginning of each year in order to pay real estate taxes, insurance, security, and the maintenance of an appropriate sales infra structure. A prudent investor would apply a 15% discount rate against future earnings in order to discount those earnings to their present worth. A prudent investor would assume that the fair market price of the real estate would appreciate at an annual rate of approximately 5% during the period of liquidation. Based on these reasonable assumptions, the prudent investor would conclude that the fair market value of the real estate is approximately $4,000,000. Tr. 136–145; P–15.

8. With respect to the coal lands, a prudent investor would discount the aggregate fair market price to account for the following factors. First, a prudent investor would project that the coal would take at least 30 years to extract and market and would anticipate collecting royalties over such period equal to about 2.7% of gross revenue from such extraction and marketing. Second, a prudent investor would apply a 15% discount rate against future royalties in order to discount these royalties to their present worth. Based on these reasonable assumptions, a prudent investor would conclude that the fair market value of the coal lands is approximately $13,000,000. Tr. 145–150; P–16.

9. The methodology employed by the experts retained by the Trustee is reason-

able and likely to be the methodology applied by a prudent investor contemplating the purchase of the Assets.

The expert testimony relied on by the Trustee in support of his analysis of the fairness of the offer of G.A. Resources and the adequacy of the Agreement of Sale was presented by Arnold S. Tesh, President of Jackson-Cross Advisors, Consulting and Advisory Group for Asset Valuation specializing in asset valuation headquartered in Washington, D.C. and doing work throughout the United States and internationally. Prior to his present employment at Jackson-Cross, the witness was a Director of Real Estate of the U.S. Railway Association. This was an association created by Congress to deal with the bankruptcy of seven major estates, including the Penn Central, Erie, Lackawanna, Reading, etc. throughout the Northeast U.S. and Midwest. His duties involved the development of a methodology for the valuation of portfolios amounting to claims in excess of $17,000,000,000 and involved the direction of in-house expert testimony for the resolution of these cases. This assignment involved virtually every conceivable type of asset: real estate, minerals, intangibles, rolling stock, rail and other track material. During the peak of the litigation he supervised 225–250 appraisers.

Prior to that assignment he was President of a subsidiary company for General Growth Properties listed on the New York Stock Exchange and at that time the largest developer of regional mall shopping centers in the world. In that assignment, he advised a Board of Directors on potential investments, disposition of assets when necessary, and periodic evaluations of the portfolio then in the area of about $750,000,000. He is also a member of the Independent Fiduciary Committee for Equitable Life Insurance Company with responsibility for assets slightly under $1,000,000,000. He has had extensive experience in evaluating coal properties in bankruptcy estates and was in charge of the real estate portion of the transfer of the Alaska Railroad from the U.S. Government to the State of Alaska in 1983.

His real estate experience extends over a period of 20 years and has had a major focus on large portfolios of real estate.

His testimony was clear, concise and convincing. He has an excellent academic background and is unquestionably competent to render an opinion as to the fairness of the offer submitted to the Trustee.

No contradictory testimony was offered in this regard by "MRC", the objector. An effort was made to challenge the competency of the witness and the correctness or significance of his presentation, but fell far short of both.

To briefly summarize the testimony offered in this respect, the witness indicated that the free and clear value of the real estate and mineral rights component of the assets is approximately $17,000,000. These constitute the majority of the assets, the remainder, cash, equipment and intangibles having a value in the neighborhood of $4,000,000. Thus, it is clear that the Trustee has established that the purchase price of the G.A. Resources offer is not only fair, but adequate.

In light of the ruling of the Third Circuit Court of Appeals in *U.S. v. Tabor*, 803 F.2d at 1307, "MRC" has no secured position whatever in these proceedings. In the opinion of the Trustee then there is little doubt that all valid lien claims will be paid in full. The subject of "prior appraisal" will be considered later in conjunction with the objection 2(d).

**"(b) The proposed sale of such concentrated resources should be advertised world-wide to obtain the maximum price possible;"**

█ In ruling on this matter we are governed by the provisions of the Bankruptcy Act of 1898, as amended, and bankruptcy rules in force during that period. Analyzing the practice in bankruptcy sales, *Colliers on Bankruptcy*, Vol. 4B (14th ed.) at p. 1157 points out that Rule 606(b)(2) provides that all sales should be by public auction unless otherwise ordered by the Bankruptcy Court. However, for good

cause shown the Court may authorize the trustee or receiver to sell either all of the property or part of it at a private sale. (citations omitted). Here again the proposed findings of the Trustee have ample support in the record and are most impressive:

"C. *Findings with Respect to Manner of Sale:*

1. The Trustee has elected to sell the assets described in the Agreement of Sale (the "Assets") pursuant to a private sale. Tr. 44; P–1.

2. The property to be sold consists of more than 15,000 acres of land divided into more than 150 separate parcels located in several counties within this district. In addition to the land, the Trustee is also selling extensive mineral rights including coal lands, coal, coal refuse, and coal banks. The sale also includes leases, contracts, cash, and cash equivalents owned by the Trustee; extensive proprietary information including maps, trade secrets, and processes; personal property and equipment; and a variety of intangible assets including choses-in-action, claims, good will, trademarks, and the like. Tr. 28; P–1.

3. The nature of the assets being sold and the rights of the Trustee in such assets are such that a public auction sale is not practical. The Trustee considered whether a public auction of the Assets was appropriate, and in the exercise of his best judgment determined that such a sale was not calculated to bring the highest price for such Assets. Tr. 48.

4. The negotiations which led to the Agreement of Sale between the Trustee and GAR took place over several months and resulted in numerous drafts of the Agreement of Sale and related exhibits. Tr. 42.

5. The Trustee considered the advisability of selling the Assets in smaller parcels or lots and determined that such an approach was not in the best interests of the estates. The Trustee believes that it would take between 10 and 15 years to dispose of the Assets in a piecemeal liquidation. Tr. 43.

6. The Trustee negotiated the private sale of the Assets to GAR only after extensive efforts to locate a buyer for the Assets, either in bulk or in smaller lots. Tr. 29–41.

7. In 1982, the Trustee placed advertisements in two major trade journals designed to reach interested purchasers in the coal industry. The Trustee also sent notice to a group of 30 domestic coal companies and another group of 30 international coal companies, in each case advising of the availability of some or all of Blue Coal's and Glen Nan's assets. Tr. 29–30; P–5, P–6.

8. The Trustee offered Resource Technologies Corporation ("RTC") a commission on the sale of the Assets if RTC could obtain a buyer. In 1983, RTC placed advertisements in five major trade journals for the coal industry and also in the *The Wall Street Journal.* In addition, RTC prepared a two page fact sheet describing the Assets and sent the fact sheet to approximately 50 to 60 individuals and companies in the United States and abroad which RTC believed were likely to have an interest in the Assets. The fact sheet advised that a several hundred page sales prospectus describing the Assets in more detail was available from RTC. More than thirty companies responded to the fact sheet by requesting copies of the sales prospectus which was then furnished to them by RTC. RTC had extensive negotiations with three groups of purchasers interested in purchasing the Assets, which negotiations did not lead to fruition. The Trustee had extensive negotiations with another two groups of purchasers, which negotiations did not lead to agreement. Tr. 33, 35, 64–72; P–12, P–13.

9. There has been extensive media coverage of certain aspects of the bankruptcies in related litigation before Judge Muir (member of the District Court for this District). Many of the newspaper accounts have included references to the availability of the Assets of Blue Coal and Glen Nan. A story appeared on the front page of the business section of *The New York Times* which noted the effect of Judge Muir's ruling in certain related litigation would be

to make thousands of acres of coal land available for purchase. Tr. 36–40; P–7, P–8, P–9.

10. A story captioned *"Blue Coal Sale Expected Soon"* appeared in the March 14, 1984, issue of *Northern Coal* magazine which reported that "after eight years of legal tangles, the anthracite reserves of the bankrupt Blue Coal Co., a subsidiary of Raymond Collieries, will be put on the market to pay the company's creditors." The article contained extensive information about the property for sale and indicated that a prospectus and further information was available from Doran & Nowalis, counsel for the Trustee. Tr. 39, P–8.

11. There has been extensive newspaper coverage in this area of the filing of the Trustee's Motion and the Trustee's Complaint including a headline story in the *Citizens Voice.* Tr. 39–40, P–9.

12. By virtue of the advertisements, the activities of the Trustee and RTC, and the media coverage, the availability of the Assets was common knowledge in the coal industry in this area. Tr. 37."

In this connection the above reference to *Collier on Bankruptcy* is again helpful. We find at p. 1165:

"If the Order directs the Trustee or Receiver to sell by private sale *no advertisement*—as distinguished from the notice to creditors of a proposed sale—is required." (citations omitted). (underscoring supplied).

Notwithstanding the foregoing, however, it can hardly be said that there was no effort to advertise the availability of these Assets for sale in view of the Trustee's presentation.

**"(c) The assets should be offered for sale in parcels and in bulk to obtain the maximum return to the Estates; and"**

■ Following the *Collier's* analysis of practice in bankruptcy sales, we find at p. 1158 of Vol. 4B of the 14th edition the following:

**"Sale in Bulk or in Parcels.**

The order of sale should likewise specify the manner in which the property shall be offered for sale, that is, in bulk or in parcels or lots. Creditors may express their wishes, the advice of the receiver or trustee will carry considerable weight, but the final decision is with the Bankruptcy Court." (citations omitted). The text goes on to say that by Local Rules a Court may leave it to the discretion of a receiver or trustee and suggest that while sale in bulk may be advantageous it may be impracticable or inadvisable. Here it would appear that the opposite is true. Efforts of the Trustee to liquidate the assets in parcels have been continuing for an unduly long time. In the Trustee's view total liquidation in this fashion would be counterproductive and continue for an indefinite period. The Trustee indicates that this matter has been studied extensively and concludes that the sale proposed is decidedly in the best interests of all parties. It is difficult to dispute and the objectors have offered no evidence whatever to sustain their positions. This judgment, reinforced as it is by the testimony submitted by Mr. Tesh (the Trustee's expert witness) is very persuasive. In this connection, a quotation from *Collier on Bankruptcy*, 14th edition, is significant:

"... The provisions of Rule 606, Rule 203(a)(2) (providing for notice to creditors of all proposed sales), serve to establish rules as to how the power of the Bankruptcy Court should be exercised or invoked. These provisions, of course, permit a broad margin of discretion and initiative in the trustee as an officer of the court. Hence, the bankruptcy courts have consistently respected the importance of the trustee's managerial functions and have abstained from any interference that would not seem indispensable for the purpose of safeguarding the interest of parties concerned, such as creditors, and bidders...."

**"(d) The proposed Agreement of Sale at less than prior appraisal value should not be approved without current appraisal."**

This objection refers to a "Report and Appraisal" made by Mr. Kern of RTC, one

of the Trustee's witnesses for the years 1976 and 1980. Trustee's expert witness explained that this in reality was a sales prospectus as opposed to a valuation. It was, he testified, considered reasonable by Mr. Kern for projected prices as they existed in 1983. The combined surface land and coal reserves in Mr. Kern's report totaled approximately $47,000,000. It is clear from his testimony that it was never to be considered fair market value of the assets. Trustee's expert witness, Mr. Tesh, used the information contained in this report extensively after discussion with the author. He demonstrated that there is a vast difference between fair market price and fair market value because the former does not reflect the period of time for liquidation at the fair market price and assumes that there is a ready, willing, and able purchaser for each parcel of land and for all of the mineral rights. The aggregate fair market price also does not reflect the costs of sale of the assets, the cost of holding the assets until sale, nor the application of an appropriate discount rate to reflect the alternative uses of investment capital and the risks inherent in a transaction of this size and complexity. Tr. at 128, 136–137. Mr. Tesh also demonstrates that the surface lands considered to have a fair market price of $18,000,000 in Mr. Kern's report are likewise to be regarded as a sales prospectus not fair market value and based on a discussion with its author really represent a fair market value of about $4,000,-000. Consequently it is clear that the purchase price of the Agreement with GAR is the equivalent of the real fair market value of the coal reserves and surface lands of $13,000,000 and $4,000,000, respectively, together with other assets totaling $4,000,-000.

To reinforce Trustee's expert witness' conclusion that the report and appraisal discussed hereinabove was, in fact, a sales prospectus and not a fair market value appraisal, we find the following exchange on Page 91 during the cross-examination of Mr. Kern, whose company authored the report:

"BY MR. SOLFANELLI:

Q. Mr. Kern, do you believe that the value of Blue Coal's properties have depreciated more than $5 million from your opinion in 1980?

A. Yes, sir, I do.

Q. Do you believe they have depreciated in value more than $7 million?

A. Yes, sir, I do.

Q. Do you believe they have depreciated more than $10 million?

A. Yes, sir.

Q. Do you believe they have depreciated in value more than $15 million?

A. Are we talking surface and coal?

Q. Surface and coal.

A. We can stop the going back and forth by saying, first, I have already stated that we have eliminated approximately $3 million for the Pine Ridge coal. We have eliminated approximately $7 million for the deep coal. That 10 million there.

The balance I have said that my estimation would be that given the royalty rate right now would be approximately half of what was used to calculate the value in this.

So, that if we took that 38 million subtracted the seven, subtracted the three that would be 28 million, divide that in approximately one-half, you would say 14 million. Other factors which could raise it or lower it, I have not investigated.

Those are the assumptions that I would change as of 1986 from the assumptions made in 1976 that are in this report.

Q. So, it is your assumption that the value of the coal resources has depreciated 50 percent in value from 28 million to 14 million?

A. Yes."

It appears that the Trustee herein has accomplished what the 7th Circuit Court of Appeals said about the District Court in the case of *Official Creditors' Committee on Behalf of Class 8 Unsecured Creditors v. Potter Material Service, Inc., (In re Potter*

*Material Service, Inc.),* 781 F.2d 99, 13 B.C.D. 1381 (7th Cir.1986):

"The district court correctly made an informed judgment after looking at all the relevant facts in this case. The court based its valuation of Potter upon "the Debtor's past earning record, the state of the economy, the highly competitive nature of the Debtor's business, the present financial position of the Debtor and the Debtor's projected future earnings." The valuation of a corporate debtor is a complex task, requiring an evaluation of considerable data concerning the past, present, and future operations of the debtor. Unless the creditors challenging a 'cram-down' reorganization can show that the court below made an erroneous valuation, this court will not reweigh the evidence on appeal. The Unsecured Creditors' Class has failed to demonstrate that the value placed on Potter by the Courts below was erroneous."

It is not suggested that the facts of the above referenced case are in any way analogous to the case at hand. It does, however, point out the complexity of the valuation of a corporate debtor and what such a task requires. Here the trustee, in addition to his own experience, has sought the assistance of professionals, one of whom at least possesses impeccable qualifications. Considering the length of the time devoted by the trustee to this liquidation and the fact that no comparable offer has ever been received by him, it is clear that the authority requested by him should be given. Creditors have waited for an unduly long time and should not be denied the right to receive some portion of their claims indefinitely. The objector, on the other hand, has offered no independent testimony bearing on the proposal made by the trustee. His position has not been sustained. We will, therefore, enter the following Order [1]

1. This Memorandum constitutes findings of fact and conclusions of law pursuant to Bankruptcy

## ORDER

AND NOW, at Wilkes-Barre, this 4th day of December 1986, upon consideration of Trustee's Complaint to Sell Property Free and Clear of Liens, Claims and Encumbrances ("the Complaint") and the Trustee's Motion for Authority To Execute Agreement of Sale and to Assume and Assign Executory Contracts (the "Motion"), and after notice and hearing thereupon on October 20, 1986 (the "Hearing") and good cause therefore appearing, it is hereby:

FOUND AND DETERMINED AS FOLLOWS:

A. James J. Haggerty (the "Trustee") is the sole duly appointed and qualified Trustee of the estates of Blue Coal Corporation ("Blue Coal") and Glen Nan, Inc. ("Glen Nan") (collectively, the "Debtors").

B. The Debtors are debtors in proceedings under the United States Bankruptcy Act (the "Act").

C. Notice of the Hearing was given to all known creditors of the Debtors and such notice complied with the provisions of the Bankruptcy Act and Rules and adequately described the nature of the Hearing and the relief requested.

D. The Trustee has full power and authority to sell the assets described in the Motion (the "Assets") and to assume and assign the executory contracts described in the Motion.

E. The sale to G.A. Resources (the "Buyer") was proposed, negotiated and carried forward in good faith by the Trustee and the Purchaser and their agents.

F. Consummation of the sale on the terms described in the Agreement, as modified by GAR's Waiver Agreement, dated October 20, 1986 (the "Waiver Agreement") is in the best interests of the Debtors' estates.

G. The Purchase Price (as defined in the Agreement) is fair and sufficient value for the Assets and that because of the vast

Rule 7052.

number of real property parcels composing the Assets and the nature of the rights of the Debtors therein it is impractical and contrary to the best interests of the estate that the Assets be sold by public auction.

H. The Buyer is a good faith purchaser for value and Purchaser, its successors and assigns and all other affected parties, are entitled to the benefits of the last sentence of Bankruptcy Rule 805.

I. The claims, liens and encumbrances of the Defendants in the Complaint are of such a character that they may be compelled to accept a money satisfaction.

J. Sale of the Assets free and clear of liens, is appropriate under the Act.

K. This Court has jurisdiction over these matters.

IT IS HEREBY ORDERED:

1. The Complaint and Motion are GRANTED and the Trustee is authorized and directed to execute the Agreement of Sale attached to the Complaint and Motion (the "Agreement") and to sell the Assets to the Buyer on the terms described in the Agreement, as Modified by the Waiver Agreement, such sale to be free and clear of all liens, claims and encumbrances (whether secured or unsecured, contingent or absolute, liquidated or unliquidated, perfected or unperfected, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded) to the fullest extent authorized by law.

2. All liens, claims and encumbrances on or against the Assets are hereby transferred to the proceeds of the sale.

3. The Trustee is authorized and directed to take all actions including the execution of documents, statements, certifications and instruments as may be necessary or appropriate for the consummation of the sale to the Buyer.

4. The Trustee's assumption and assignment to the Buyer, at the time of consummation of the sale described in the Complaint and Motion, of all the Trustee's right, title and interest in all leases and executory contracts to be assigned to the Buyer under the Agreement of Sale (the "Assigned Contracts") is approved and the Trustee shall have no further liability with respect to any Assigned Contract after the date of closing.

5. The Buyer shall assume no liabilities of the Trustee or the Debtor except liabilities arising after closing under the Assigned Contracts.

6. All parties in interest are enjoined from (a) taking any action intended to interfere with the transfer of the Assets or the Buyer's use and enjoyment thereof; (b) asserting or attempting to assert against the Buyer, its successors or assigns (including is mediate and immediate buyers or lessees), any claim, action or proceeding (whether administrative or judicial in nature) for damages, penalties, fines, injunctive or other legal or equitable relief, arising out of or based in whole or in part upon facts, situations, claims, matters or events existing prior to the date of Closing, whether or not such claim, action or proceeding was brought or could have been brought against the Trustee, Blue Coal or Glen Nan. The injunction set forth herein shall be binding on all parties-in-interest, their officers, agents, servants, employees, and attorneys and upon those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise. It is the intent of this Order that the Buyer shall take title to the Assets free and clear of each and every claim, lien, encumbrance, action (whether equitable, legal, statutory, regulatory or otherwise), proceeding, demand, setoff, counterclaim, recoupment, off-set, or other right of payment or equitable relief of any type or nature whatsoever.

7. This Court shall retain jurisdiction to enforce the provisions of this Order (including the injunction contained herein) and the Agreement and to resolve any dispute concerning this Order, the Agreement, or the rights and duties of the parties hereunder or thereunder.