**In re BLUE COAL CORPORATION, Bankrupt.**

**In re GLEN NAN, INC., Bankrupt.**

**Bankruptcy Nos. 76–1311, 78–604.**

United States Bankruptcy Court, M.D. Pennsylvania, Wilkes–Barre Division.

Jan. 15, 1997.

See also 206 B.R. 721.

**8.** See Report of the Third Circuit Task Force, Court Awarded Attorney's Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237, 265 (1985).

Richard W. Cross, State of New York, Department of Law, Albany, NY, for State of New York.

D. Alan Harris, Chicago, IL, for The Commonwealth of PA.

### OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

A Motion requesting allowance of fees has been filed by the Trustee, Frank M. McDonnell, requesting the maximum award possible under the provisions of § 48.c.(2) of the Bankruptcy Act of 1898 (hereinafter "Act") providing for compensation to a trustee authorized to operate a business. That request amounts to $619,982.83, with credit for earlier payments to the Trustees.

The trustee's maximum commission is based on the provisions of § 48.c.(1) of the Act as follows.

(1) Normal Administration.—When the trustee does not conduct the business of the bankrupt, such sum as the court may allow, but in no event to exceed 10 per centum on the first $500 or less, 6 per centum on moneys in excess of $500 and not more than $1,500, 3 per centum on moneys in excess of $1,500 and not more than $10,000, 2 per centum on moneys in excess of $10,000 and not more than $25,000, and 1 per centum on moneys in excess of $25,000, upon all moneys disbursed or turned over by them to any persons, including lienholders:

The maximum for a trustee conducting the bankrupt's business is set forth in § 48.c.(2) as twice the maximum fees allowed under § 48.c.(1).

This request has been opposed by two creditors of the estate, that is, the State of New York and The Commonwealth of Pennsylvania, who appear to limit their objections to the request for double compensation.

A history of Blue Coal, both pre and post bankruptcy has been set forth in the numerous reported opinions of the court. The reader is referred to those cases for details not found in this opinion.[1] This Movant is

---

William H. Schorling, Pittsburgh, PA, for Trustee, Frank M. McDonnell.

1. *United States v. Gleneagles Inv. Co.,* 584 F.Supp. 671 (M.D.Pa.1984)

*United States v. Gleneagles Inv. Co.,* 571 F.Supp. 935 (M.D.Pa.1983)

*United States v. Gleneagles Inv. Co.,* 565 F.Supp. 556 (M.D.Pa.1983), *aff'd in part and vacated in part sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.

the third Trustee over a twenty year span charged with liquidating the massive mineral reserves and land holdings of the Bankrupt.

The case began as an involuntary proceeding in 1976, the major assets of which were fully encumbered by lienholders. Years later, in 1987, the District Court for the Middle District of Pennsylvania, after approximately 120 trial days, declared that the Bankrupt's 17,000 acres of land, together with the largest anthracite coal reserves in the world, were virtually lien-free. *United States v. Gleneagles Inv. Co.*, 565 F.Supp. 556 (M.D.Pa.1983), *aff'd in part and vacated in part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

Initially, Charles A. Shea, Jr. was appointed Receiver and then Trustee. The parties agree that he has been fully compensated for his services by an earlier allowance in the amount of $2,584.28. (Final Report, Accounting, and Application for Allowance by Trustee, Charles A. Shea, Jr., filed March 17, 1980.)[2] He was succeeded as Trustee by Attorney James P. Haggerty on January 16, 1979. In 1987, Mr. Haggerty was tabbed by the Governor of Pennsylvania, Robert A. Casey, to be his official counsel. Attorney Haggerty resigned and his law partner, Attorney Frank M. McDonnell, was appointed to succeed him. While Attorney McDonnell originally sought compensation only for himself,

subsequent pleadings, as well as the testimony of both Haggerty and McDonnell, indicate that McDonnell is pursuing his commission not only for his own benefit, but also for the benefit of his partnership including James Haggerty. In that regard, Haggerty also maintains that his period of service should be considered when making the award.

The Objectors question this procedure and assert that Haggerty has waived his claim by failing to file an appropriate application by the administrative claims bar date set earlier in this case.

While McDonnell's request to collect all commissions owing to both he and his partner is unorthodox, I am inclined to grant the request and treat this application as a joint one of both Messrs. Haggerty and McDonnell. Both were present during the hearing. The commissions to be awarded are based on total disbursements, the bulk of which occurred during Attorney McDonnell's tenure. Furthermore, the court is independently required to evaluate earlier administrations if only to measure the degree to which the Bankrupt continued operations.

Despite the protests of Objectors, they appeared well prepared to cross-examine Attorney Haggerty on his activities. Even after the court provisionally allowed the joint request to proceed, no request to continue the hearing was made.

References to the "Trustee" in this opinion shall be interpreted to mean either Mr.

---

1986), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987)

*In re Blue Coal Corp.*, 168 B.R. 553 (Bankr. M.D.Pa.1994)
*In re Blue Coal Corp.*, 166 B.R. 816 (Bankr. M.D.Pa.1993)
*In re Blue Coal Corp.*, 1994 WL 325431 (Bankr. M.D.Pa.1993)
*In re Blue Coal Corp.*, 152 B.R. 710 (Bankr. M.D.Pa.1993)
*In re Blue Coal Corp.*, 150 B.R. 592 (Bankr. M.D.Pa.1993)
*In re Blue Coal Corp.*, 112 B.R. 683 (Bankr. M.D.Pa.1990)
*In re Blue Coal Corp.*, 67 B.R. 798 (Bankr. M.D.Pa.1986)
*In re Blue Coal Corp.*, 59 B.R. 157 (Bankr. M.D.Pa.1986)
*In re Blue Coal Corp.*, 47 B.R. 754 (Bankr. M.D.Pa.1985)

*In re Blue Coal Corp.*, 47 B.R. 758 (Bankr. M.D.Pa.1985)

**2.** According to the Final Report, the rather odd amount is explained as "being the value of cash assets held by your applicant." Paragraph 8 of the Final Report further states, "Your applicant also reserves the right at a future date to submit a request for compensation based upon the value of assets held other than cash items upon which this computation was made." While Charles A. Shea, Jr. has since deceased, his son, Charles A. Shea, III, is a member of his father's office and has been a very active participant in this estate on behalf of the Anthracite Health and Welfare Fund, a secured creditor. He most certainly was aware of the administrative claims bar date of November 11, 1994. No further request has been made on behalf of Charles A. Shea, Jr.

McDonnell or Mr. Haggerty, or both, unless otherwise indicated.

In advancing the Trustee's case for maximum commissions, counsel for the Trustee makes the following arguments.

(1) During his tenure, Trustee McDonnell has liquidated 98% of the estate's 17,000 acres.

(2) He was successful in the highly litigious bulk sale to Earth Conservancy.

(3) He secured over $2,000,000.00 in liquidated damages from two earlier failed sale attempts.

(4) He obtained settlements with the principal creditors.

(5) He is responsible for an anticipated dividend of approximately 63% to general unsecured creditors.

(6) The Trustees conducted the business of the Bankrupt by employing people, entering into coal leases, supervising strip mine operations, securing insurance, paying taxes, and maintaining inventories.

(7) The Trustees' estimated time, based on their hourly rate as lawyers, justify the request.

The Objectors counter by alleging that

(1) Double compensation is only available to a trustee conducting business. The Trustees did not conduct the Bankrupt's business.

(2) The Trustees brought no special knowledge to the case, but rather hired professionals, such as attorneys, accountants, and appraisers, to advise them.

(3) The Trustee kept no time records.

(4) The Bankruptcy Act includes a standard of "strict economy" which requires the court to be conservative in considering the award of fees.

### Rule 219. Compensation for Services Rendered and Reimbursement of Expenses Incurred in a Bankruptcy Case

(c) *Factors in Allowing Compensation.*

(1) *General.* The compensation allowable by the court to a trustee, receiver, marshal, attorney, accountant, or other person entitled to compensation for services rendered in the administration of a bankrupt estate shall be reasonable, and in making allowances the court shall give due consideration to the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors.

2A Collier Bankruptcy Manual (2d ed. 1977)

■ On August 1, 1983, the then-existing Bankruptcy Rules were "superseded" by new Bankruptcy Rules which omitted reference to "conservation of the estate" as a factor in the allowance of compensation. These new rules were applicable to all pending proceedings, "except to the extent that in the opinion of the court, their application in a pending proceeding would not be feasible or would work injustice, in which event the former procedure applies." Order of the Supreme Court Adopting the Rules of Bankruptcy Procedure, April 25, 1983.

The maximum compensation allowed a trustee is based on a percentage of funds "disbursed or turned over." 11 U.S.C. § 48.c. I find that fairness dictates that "conservation of the estate" should be a factor only on those monies available for disbursement before August 1, 1983, the effective date of the new rules.

As to those Rule 219 considerations of the nature, extent, and value of services to the estate, Congress has expressed a desire to retain those standards by incorporating these factors directly into current Section 330(a)(3), (11 U.S.C. § 330(a)(3)), thus giving legislative approval to the former Bankruptcy Rule. We will therefore consider those factors to have survived adoption of the new rules.

■ Before discussing the various standards considered in awarding compensation, it would be helpful to initially determine whether the Applicant conducted business during his tenure.

* * * to conduct the business of the bankrupt, in my opinion, means that the trustee must substantially carry on the day by day, normal activities, which the bankrupt, as a going concern, pursued.... That the court had authorized Scroggins to conduct the business of the bankrupt is not sufficient. The statutory compensation is de-

pendent on actual services rendered. *In re Orbit Liquor Store*, 439 F.2d 1351, 1355 (5th Cir.1971).

The business of the Bankrupt, Blue Coal Corporation, and its affiliated companies, the Raymond Group, was an elemental topic of a decision by the Honorable Judge Malcolm Muir in declaring that the major lien against these properties, the IIT loan, constituted a fraudulent conveyance. *United States v. Gleneagles Inv. Co.*, 565 F.Supp. 556 (M.D.Pa.1983), *aff'd in part and vacated in part sub nom., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom., McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). Judge Muir made the following findings of fact in that regard.

18. During the period between 1966 and November 26, 1973, the Raymond Group owned over 30,000 acres of land located in Luzerne and Lackawanna Counties.

19. Between 1966 and 1973, Blue Coal was either the largest or one of the largest anthracite coal producing companies in the United States.

20. In 1967, the Department of Environmental Resources of the Commonwealth of Pennsylvania (DER) issued an order directing Blue Coal to reduce the pollutants being pumped into public waterways from its deep mine operations or to close such operations.

21. As a result of the DER order, Blue Coal began to phase out its deep mining operations and intensify its conversion to strip mining operations.

22. "Strip mining" is above-ground mining of coal whereby the ground and rock above the coal is stripped off and the coal is removed.

23. Blue Coal incurred substantial expenses in converting to strip mining because of the cost of new and different equipment required by that process. These expenses depleted the cash reserves of the Raymond Group.

35. In 1973, Raymond Colliery and Blue Coal together employed between 2,000 and 3,000 employees.

36. During the five-year period ending November 26, 1973, the coal production business of the Raymond Group operated at a loss.

37. During the five-year period ending November 26, 1973, the Raymond Group was largely supported by the sales of its surplus lands.

102. The closing of the IIT loan was then re-scheduled for November 26, 1973.

162. Within two months after the November 26, 1983 [sic] closing, the deep coal mining operations of Blue Coal were shut down.

163. The Gillens and Clevelands [principals of the seller,] knew the deep mines were flooded and were no longer economically feasible to operate. They did not share this knowledge with IIT or Durkin [principal of the buyer].

164. Within six months after the November 26, 1973 closing, the Raymond Group had ceased substantially all of its strip mining operations.

*Id.* at 563–572.

Our earlier opinions of this court are consistent with Judge Muir's findings as well as the evidence offered at the hearing. Of the 30,000 acres of land controlled by the Raymond Group, approximately 17,000 acres were owned by Blue Coal. That land included vast coal and culm resources as well as substantial quantities of sand and gravel, all suitable for sale. Timber was also present in marketable amounts. *In re Blue Coal Corp.*, 168 B.R. 553 (Bankr.M.D.Pa.1994).

Testimony was given at the time of hearing that pre-bankruptcy Blue Coal entered into a number of coal leases wherein royalty payments would be forthcoming as measured by the quantity of coal removed by the tenant. Furthermore, the Bankrupt leased a relatively small amount of land to others as a source of income to supplement its sales of non-essential real estate.

Therefore, this court finds that coal sales, strip mining, coal leasing, land sales, and minor land leases describe the operation of Blue Coal as it was constituted when last it functioned prior to bankruptcy.

Against this backdrop, the court makes these further findings from the evidence offered at the time of hearing.

(1) From the Appointment of James Haggerty on January 16, 1979 until the last two years, the Trustee has employed 4 to 6 employees.

(2) Haggerty and McDonnell entered into coal and land leases.

(3) The proceeds of these leases approached $3,000,000.00.

(4) The Trustee sold various parcels during his administration.

(5) The Trustee was required to conduct ongoing and continuing negotiations with the state environmental regulators.

While other evidence has been offered in support of the Trustee's request for fees, none of them appear to directly favor a finding that the Trustee operated the business. This included the apparent success of the administration due to the anticipated distribution to non-priority, unsecured creditors of 60–65% of their claim; the participation in the endless litigation that dogged the case throughout its entire twenty year history; the need for investigation of the company's financial affairs; the continuing concerns of taxes, insurances, inventories, and fund investments; and the successful pursuit of the bulk sale to Earth Conservancy.

While the Trustees kept no significant time records, they estimate their total time expended in this case over 18 years as 6,075 hours or 6.75 hours per week. (Trustee's Reply to Objections filed December 9, 1996 at 7.)

The court is authorized to appoint a trustee under § 2.a.(17) of the Act. Clause 5 of Section 2a. empowers the court to "authorize the business of bankrupts to be conducted for *limited periods* by receivers, the marshals, or trustees, if necessary, in the best interests of the estates, and allow such officers additional compensation for such services, as provided in Section 48 of this Act." (Emphasis ours.) This provision must be read in tandem with § 47.a.(1) which reads as follows under the heading "Duties of Trustee": "Trustees shall (1) collect and reduce to

money the property of the estates for which they are trustees, under the direction of the court, and close up the estates as *expeditiously* as is compatible with the best interests of the parties in interest." (Emphasis ours.)

A review of these sections undeniably evidence an intent by Congress that the operation of a bankrupt by a trustee is an extraordinary event which should be pursued only in exceptional circumstances and for brief durations so as to maximize the return to creditors.

Carrying on the business of the bankrupt involves extra work and responsibility for which more than the usual compensation is deserved. . . .

It is obvious that, for the double commission provisions to be applicable, the business must have been carried on as a going concern and that a few casual business transactions prior to or in course of liquidation do not meet the test. . . .

To conduct a business means that the trustee must substantially carry on the day by day normal activities which the bankrupt as a going concern pursued.

6 James M. Henderson, *Remington on Bankruptcy* § 2745 at p. 312–313 (5th ed. 1952).

The rationale for authorizing the operation of the business can be found in legislative history as reported in *Slattery & Co.*, 294 F. 624, 627 (2d Cir.1923).

Report No. 691 of the Senate Judiciary Committee of the Sixty–First Congress, Second Session, referring to compensation of receivers, is quoted in section 2115, of Remington on Bankruptcy, second edition. In this report, it is stated: 'As to the matter of additional compensation for the conducting of the business by the receiver or trustee, the act of 1898, as originally passed, gave no such additional compensation. This was an injustice, because the conducting of the business of the insolvent is frequently necessary, particularly when adjudications are contested or when the assets consist of an active business which can be best sold as a going concern.'

An involuntary petition against Blue Coal was filed on December 16, 1976. It was adjudicated a Bankrupt on February 22, 1977, well before Mr. Haggerty was appointed Trustee.

As indicated earlier in Judge Muir's findings, the Raymond Group, of which Blue Coal was a part, ceased mining operations in 1974, two years prior to adjudication. I can see no evidence on this record of a desire by the Trustee to sell the Bankrupt as a going concern.

Of course, I can find that significant sums of money were generated by the Trustee from coal leases (royalties), land leases, and the sale of individual parcels. My calculations compute that figure at approximately $5,000,000.00. While this is a considerable sum, these figures are not significant, relative to the size of the Bankrupt. Blue Coal was not a storefront purveyor but the owner of 3% of all the lands in Luzerne County, Pennsylvania.

Five Million Dollars ($5,000,000.00) represents only about one-third of the final bulk sale which included virtually all of the assets of the estate. It accounts for about one-fourth of the value of the assets as found by this court. *In re Blue Coal Corp.,* 168 B.R. 553, 568 (Bankr.M.D.Pa.1994). These figures allow us to conclude that the assets of the estate generated annual gross receipts from operations of less than 2% of the final liquidation price under the administrations of Trustees Haggerty and McDonnell. I must note that this is *not* profit, but rather, total receipts from all operations associated with Blue Coal as an operating entity.

I cite these statistics not for the purpose of minimizing the efforts of the Trustees, but rather, to determine whether the Trustees did, indeed, operate the Bankrupt as that term is understood in the law. Whatever the course of this decision, it must rest on a foundation that would firmly support it.

Blue Coal consisted of 17,000 acres, a mere 2% of which were disposed of in the twenty years prior to final liquidation. *In re Blue Coal Corp.,* 168 B.R. 553, 559 (Bankr.M.D.Pa. 1994).

The Bankrupt's assets include probably the largest reserve of anthracite coal deposits in the world and yet, royalties accounted for less than $150,000.00 in annual receipts. *Id.* at 559 and Revenue Summary attached to Trustee's Final Report filed November 15, 1996.

The Raymond Colliery and Blue Coal employed between 2,000 and 3,000 individuals in 1973 yet the Trustee's employees numbered between 4 and 6.

■ "[T]he 'business is conducted by the receiver', where the receiver carries on, at least substantially the usual, customary, and normal activities of the bankrupt as a going concern." *In re Duke,* 15 F.2d 92 (E.D.Mo. 1924). (Receivers and trustees were held to virtually the same standards in determining whether a business was conducted.)

Based on this discussion and for these reasons, I conclude that the Trustees are not entitled to the compensation provided for a trustee operating a business. I so conclude despite the fact that the liquidation has been admittedly complex. *In re Nixon,* 23 F.Supp. 310 (W.D.Pa.1938). Nevertheless, judges have been advised that in fixing allowances for services to the court, "vicarious generosity" should receive no countenance. *Coskery v. Roberts & Mander Corp.,* 200 F.2d 150, 154 (3d Cir.1952) *citing In re Gilbert,* 276 U.S. 294, 296, 48 S.Ct. 309, 310, 72 L.Ed. 580 (1928).

■ Having denied the Trustee's request to receive commissions under § 48.c.(2) as an operating trustee, the court turns to his entitlement at the standard rates for a normal administration under § 48.c.(1).

■ As pointed out earlier, an allowance to a trustee is based on the nature, extent, and value of the service performed.

In an earlier opinion, I concluded that Mr. McDonnell was not a "hands on administrator." *In re Blue Coal Corp.,* 168 B.R. 553, 567 (Bankr.M.D.Pa.1994). Investments were moved from account to account as interest rates dictated by Attorney Doran, his former counsel. Receipts and disbursement reports were prepared by employees of the estate. Lists of potential purchasers of real estate

were maintained by Mr. Doran or his firm, Doran & Nowalis. Coal leases were negotiated by Doran. The Trustee rarely visited the properties scattered about Luzerne County and expressed minimal awareness of their individual characteristics or even their location.

The Trustee appears to have delegated a great deal of his duties to others, reserving the final approval of such actions to himself. As further pointed out in the earlier opinion, McDonnell "succeeded to the Trusteeship vacated by his then law partner, James Haggerty, in 1987, and at that point, inherited a bankruptcy case that was in its eleventh year. It is not surprising that the Trustee relied a great deal on his counsel, since that firm had been involved with Blue Coal from the very inception of the case." *Id.* at 567.

The Trustee's management approach was severely tested when a rift with Attorney Doran developed over the advisability of negotiating a bulk sale to the eventual purchaser, Earth Conservancy. From that point on, the Trustee pursued the bulk sale with a conviction not theretofore exhibited. Each one of the active unsecured creditors lined up in opposition to the sale, but the Trustee was steadfast. The Trustee spent four days on the witness stand, at times waiving, perhaps inadvertently, the attorney-client privilege under a blistering attack from the opponents to the sale with nary a peep from his counsel. The rift with his counsel evolved into a virtual chasm when Doran refused to call a certain expert witness at the sale hearing and the Trustee responded by "firing" his lawyer and bringing the hearing to a halt. At that point, in August of 1993, McDonnell was without counsel, facing unanimous opposition from the unsecured creditors and certainly unsure of whether he would see another dime of compensation after serving for six years. A lesser individual would have tendered his resignation to the court on the spot. To the contrary, this Trustee responded with tenacity. He hired new counsel, pursued the sale to culmination, and has taken this estate to the brink of completion. Had such an attitude prevailed at an earlier time, the court has little doubt that this estate would have long since been closed.

While this court may question the earlier performance of the Trustees, I do not question their integrity. They served in a case of major proportions for this area and undoubtedly performed every task requested of them by counsel.

The award of maximum commissions is customarily awarded, in the absence of extraordinary circumstances. 6 James M. Henderson, *Remington on Bankruptcy* § 2736 (5th ed. 1952). I do not hesitate to conclude that the maximum allowance permitted by § 48.c.(1) of the Bankruptcy Act (for a trustee not conducting business) is a reasonable award of compensation in this case. I therefore conclude that Trustees Haggerty and McDonnell are allowed compensation in the total amount of $309,991.42, less the earlier payments of $87,584.28 to the three Trustees.