## In re BLUE COAL CORPORATION, Bankrupt.

## In re GLEN NAN, INC., Bankrupt.

### Bankruptcy Nos. 76–1311, 78–604.

United States Bankruptcy Court, M.D. Pennsylvania, Wilkes–Barre Division.

June 10, 1994.

---

William H. Schorling, Pittsburgh, PA, for Frank J. McDonnell.

Michael Martineau, U.S. Dept. of Justice, Tax Div., Washington, DC, for I.R.S.

Charles A. Shea, III, Wilkes–Barre, PA, for Anthracite Health and Welfare Fund.

D. Alan Harris, Chicago, IL, for Com. of Pennsylvania.

Paul M. Pugliese, Kingston, PA, for Luzerne County.

William G. Tressler, State College, PA, for Resource Technologies Corp.

Richard W. Cross, New York State Dept. of Law, Albany, NY, for State of New York.

Bradford Dorrance, Harrisburg, PA, for Shipping and Coal Co.

Ronald J. Wydo, Wilkes–Barre, PA, for Hanover Tp.

John H. Doran, Wilkes–Barre, PA, for Doran & Nowalis.

### OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

For the third time in the past seven (7) years, this court has been asked to approve a bulk sale of all of the assets of Blue Coal Corporation and Glen Nan, Inc. ("Blue Coal"). Both of those prior motions met with court approval. See *In re Blue Coal Corp.,*

67 B.R. 798 (Bkrtcy.M.D.Pa.1986) and *In re Blue Coal Corp.*, No. 76–1311, No. 78–604 (Bkrtcy.M.D.Pa. April 17, 1989) (Order approving sale). Despite that, the sales did not close because of the inability of the buyer to secure financing.

One would think that after two (2) Motions to Sell Property were successfully approved by the court, the Trustee would have little difficulty in obtaining approval of the pending motion. Notwithstanding that previous success, however, Murphy's Law (the proposition that if things can go wrong, they *will* go wrong) seems to have had more of an impact in this specific proceeding than even the bankruptcy law.

In January, 1992, a non-profit entity known as Earth Conservancy was created at the request of United States Congressman Paul E. Kanjorski, a member of the House of Representatives from the Eleventh Congressional District of Pennsylvania.

The board of directors of Earth Conservancy includes a cross section of business and educational representatives including Attorney Peter Kanjorski, brother of the Congressman, and Joseph Yudichak, whose membership on the board will be discussed later in this opinion. *Transcript, January 24, 1994, page 124.*

The purpose of this entity was to establish an applied research center for the application of technology to clean up environmentally damaged lands and to create commercially successful ventures in the process. *Transcript, January 24, 1994, page 127.*

To implement its stated goals, the Earth Conservancy made no secret of its desire to acquire the seventeen thousand (17,000) acres of Blue Coal with funds appropriated by the United States Government.

With that purpose in mind, the Earth Conservancy began negotiations with the Trustee in bankruptcy, Frank McDonnell, to acquire the bankrupts' assets. These negotiations initially culminated in an agreement being executed in April of 1992 by the Trustee and by Earth Conservancy. *Transcript, August 5, 1993, page 147.*

When it became apparent to the Trustee that the agreement did not, in fact, agree with the terms of the purchase as understood by the Trustee, Mr. McDonnell disclaimed the agreement and instructed his then counsel Attorney John Doran to renegotiate its terms. *Transcript, August 8, 1993, page 137.*

During this hiatus, a difference in liquidation policy occurred between the Trustee and certain active unsecured creditors as to the methodology for asset disposition. The Trustee wished only to consider the liquidation of the Blue Coal assets in bulk to one buyer. On the other hand, certain unsecured creditors were convinced that a piecemeal liquidation effort was in their best interest and would have resulted in a more significant distribution. That concern became so great that the United States of America through the tax division of the Department of Justice actually applied to the bankruptcy court for an order compelling the bankruptcy Trustee to liquidate on a piecemeal basis.

Hearings commenced thereon and resulted in this court issuing an Order on January 12, 1993, which, inter alia, compelled the Trustee to liquidate on a piecemeal basis without foreclosing the possibility that a bulk sale could be negotiated should those circumstances arise.

Pursuant to that Order of January 12, 1993 (Liquidation Order), the Trustee initiated liquidation and, in fact, executed eight (8) sales agreements which were noticed to creditors on March 31, 1993.

During this notice period, serious negotiations with Earth Conservancy began anew at which time the Trustee instructed his counsel not to pursue any further piecemeal sales efforts pending the conclusion of these negotiations with Earth Conservancy. The Trustee set his own deadline of May 15, 1993 when either a contract would be negotiated with Earth Conservancy or piecemeal liquidation efforts would again be implemented. *Transcript, August 9, 1993, page 72.* An agreement was, in fact, reached with the Earth Conservancy. That agreement was filed of record and a Motion to sell this property free and clear of liens was filed on June 16, 1993.

Thereafter, the United States of America, objecting to the delay caused by this negotia-

tion, filed a motion to compel liquidation or remove the trustee on August 9, 1993.

The contract with Earth Conservancy provides for the liquidation of virtually all of the property of the estate to Earth Conservancy pursuant to either of the following options at the Trustee's discretion: (1) 12.6 million dollars and either a waiver of all tax claims by the state and federal governments or, 2 million dollars with some figure adjusted in between should only partial waivers be obtained or, alternatively, (2) 10.6 million dollars plus either various waivers of state and federal claims including, but not limited to, tax claims or 4 million dollars.

Prior to initiating testimony, the Trustee withdrew his request for the court to consider the second alternative and focused his efforts on approval of the 12.6 million dollar offer together with either waivers or 2 million dollar supplement.

By Stipulation for the purposes of this hearing, the tax claim of the Commonwealth is Four Hundred Sixteen Thousand Eight Hundred Twenty–Two and 53/100 Dollars ($416,822.53) and the priority tax claim of the federal government is Three Million Three Hundred Four Thousand Eight Hundred Thirteen and 27/100 Dollars ($3,304,813.27). *Transcript, January 26, 1994, pages 6 and 7.* Since there was no evidence offered as to the likelihood of securing "waivers" from the taxing authorities, this court will presume that the offer by Earth Conservancy is equivalent to an established offer of 14.6 million dollars with any greater value to be speculative.

Supporting approval of the agreement of sale, despite a provisional objection[1], is the principal secured creditor, The Anthracite Health and Welfare Fund ("Fund"), who holds a disputed judgment claim in the approximate amount of 2.4 million dollars together with possible interest.

Opposing the agreement of sale are the United States of America, the Commonwealth of Pennsylvania, the Luzerne County Tax Claim Bureau, the State of New York, and Shipping and Coal Company, all of whom are pre-petition creditors of the estate.

No unsecured creditor of the estate actively supported the Trustee's agreement of sale with the Earth Conservancy.

Hearings on the Motion for free and clear sale began August 4, 1993, and continued for six (6) days during which time the Trustee testified with regard to the general history of this case as well as the specific negotiations with Earth Conservancy.

During the testimony of the Trustee, this court held that the attorney-client privilege had been waived with regard to certain topics including negotiations with the Earth Conservancy and concerning the occupation of a part of the Blue Coal lands by an entity known as the Eleventh Congressional Regional Equipment Center ("REC"). *Transcript, August 6, 1994, page 76, et seq.* By reason of that waiver, various and sundry items of correspondence between the Trustee and his counsel were made a part of the record. With that release of information, it became obvious that a significant disagreement existed between the Trustee and his lawyer as to the efficacy of negotiations with the Earth Conservancy and the adequacy of the consideration offered by that entity.

Tension between the Trustee and his counsel was apparent. At the beginning of the sixth day of testimony, John Doran approached this court and notified it that he would not sponsor the appraisal testimony of expert, Arnold Tesh, because Doran apparently did not believe the proffered testimony was well grounded in fact. *Transcript, August 11, 1993, page 16.*

The court's reaction to that disclosure was that unless counsel believed the appraiser would perjure himself, he had an obligation to put on those experts requested by the Trustee or he could withdraw as counsel to the Trustee or the Trustee could consider relieving Attorney Doran from his duties and retain new counsel. Since none of those events occurred, the court was in a position to hear the testimony of appraiser Tesh.

After this dialogue with the court and a break from the proceedings so that all parties could consider their positions, the Trustee returned to the court and orally made a

---

1. The objection was withdrawn on the last day of hearings. *Transcript, January 27, 1994, page 187.*

Motion to discharge his counsel and for the court to recuse itself by reason of the court's alleged "long time friendship with Mr. Doran". *Transcript, August 11, 1993, page 33.*

The court denied recusal after consideration since it considered his relationship with Attorney John Doran to be no different than his relationship with many other lawyers during the time of the court's private practice of bankruptcy law until his appointment to the bench in January of 1992.

Despite that denial, the court left open for reconsideration the request for recusal along with the request of the Trustee to discharge his counsel by requiring that written Motions be filed within fifteen (15) days for further consideration by this court.

Of course, the sale hearings abruptly adjourned pending further decisions by the court relative to these impending motions.

On September 2, 1993, based on the Motion of the Trustee, Attorney John Doran was discharged over the objections of the United States and the State of New York. *Transcript, August 11, 1993, page 31 and Transcript, September 2, 1993.*

The Trustee's first attempt to secure new counsel failed when the court refused to approve the law firm of Dilworth, Paxson, Kalish & Kauffman on September 13, 1993.

On October 1, 1993, the Trustee's application to appoint the firm of Klett, Lieber, Rooney & Schorling was approved.

In November of 1993, both the United States and the law firm of Doran & Nowalis filed requests with the district court to withdraw the reference. Such requests were denied by the Honorable Malcolm Muir on December 23, 1993.

At this juncture, another strange twist to the proceedings took place. On December 16, 1993, former counsel to the Trustee, Doran & Nowalis, filed an application to intervene as an objecting creditor by reason of a significant administrative claim it had against the estate for legal fees and it sought permission to file a late objection to the Motion for authority to sell the property free and clear.

After a hearing on this matter, the court denied this request on January 11, 1994 concluding that there was no compelling reason to allow a lawyer to object to the very motion it filed. Nevertheless, the court allowed Doran & Nowalis an opportunity to consult with the objectors during the hearing and petition the court to offer evidence before the close of the record.

During the pendency of these Motions, the Trustee's new counsel, Klett, Lieber, Rooney & Schorling, was bringing itself "up to snuff" on the entire case generally and the free and clear Motion specifically.

It was also during this period of time that counsel to the United States, Harry J. Giacometti, Esquire, resigned as government counsel and was replaced by Michael Martineau, Esquire.

With these new players, the court considered itself fortunate that it was able to reconvene the sale hearing on January 14, 1994.

After six (6) more days of testimony, the proceeding concluded on January 27, 1994.

Factually, the Blue Coal bankruptcy was initiated by an Involuntary Petition in 1976 under the Bankruptcy Act of 1898 which continues to control the disposition of the case. In 1978, the related corporation of Glen Nan, Inc. joined Blue Coal Corp. in bankruptcy and both have been treated as jointly administered cases since that filing.

In 1980, the United States of America initiated litigation in the United States District Court for the Middle District of Pennsylvania against various entities (*Gleneagles Investment Co., et al.*) in an attempt to void various mortgages that encumbered the property of Blue Coal Corp.–Glen Nan, Inc. After lengthy hearings, U.S. District Judge Malcolm Muir issued a series of decisions in favor of the United States effectively voiding the mortgage encumbrances. *United States v. Gleneagles Investment Co., et al.,* 565 F.Supp. 556 (M.D.Pa.1983), 571 F.Supp. 935 (M.D.Pa.1983), 584 F.Supp. 671 (M.D.Pa. 1984). Those dispositions were appealed first to the Circuit Court and then to the United States Supreme Court which denied certiorari.

Thereafter, the Blue Coal assets were no longer subject to the liens of the avoided mortgages.

The Blue Coal properties include over four hundred (400) parcels of land approximating seventeen thousand (17,000) acres of real estate in the Wyoming Valley situate in Northeastern Pennsylvania. It accounts for three percent (3%) of all lands in Luzerne County. *Exhibit P–28, page 27.* The bankrupts' assets further include probably the largest reserve of anthracite coal deposits in the world. *Transcript, January 14, 1994, page 120.* The estate also holds other major assets in the form of timber, sand and gravel and culm.

Since 1976, the Trustee has liquidated merely two (2) parcels of property accounting for approximately two percent (2%) of the total land acreage of the estate. The creditors were seemingly content with the Trustee's pace of liquidation until the Motion of the United States to compel liquidation was filed on June 18, 1992.

In 1986, the Trustee moved to sell the real estate free and clear of liens to G.A. Resources, which Motion was approved for a net consideration of 18 million dollars. *In re Blue Coal Corp.,* 67 B.R. 798 (Bkrtcy. M.D.Pa.1986). This sale did not occur because of the inability of the purchaser to secure financing.

Thereafter, the bankruptcy court approved the Trustee's Motion for free and clear sale of property to Energy Recycling Group (ERG) for 18 million dollars, which approval occurred on April 17, 1989. Again, the purchasers were unable to secure financing to conclude that purchase.

Prior to negotiating the liquidation of virtually all of the assets of Blue Coal to Earth Conservancy in April, 1992, no specific appraisal was performed on behalf of the estate in order to assist the Trustee in negotiating sales or otherwise developing a marketing strategy.

After the April, 1992 agreement with the Earth Conservancy, the Trustee on April 17, 1992, requested and thereafter obtained permission to hire the firm of Resource Technologies Corp. ("RTC") to appraise the real estate, coal and culm holdings of the bankrupt. That appraisal was finalized in January in 1993 and it concluded that the holdings of Blue Coal, except for timber, sand and gravel, and improvements, should be valued at the sum of 24.7 million dollars. *(1993 Appraisal) Exhibit P–4.*

During the August, 1993 hearings on this Motion for free and clear sale, it became apparent that certain assets of the bankrupt were still never appraised. These assets included timberland, sand and gravel, and improved structures which were thereafter valued prior to the reconvened hearing in January, 1994.

### STANDARD OF REVIEW

This court's analysis of the facts we find critical to an ultimate determination of the Trustee's request to approve the sale is necessarily dependent on those standards this court must utilize in deciding whether or not this sale should be approved.

A review of numerous cases under the Bankruptcy Act of 1898, (the "Act"), considering the sale of property of a bankrupt estate suggests that this body of case law has evolved from three (3) separate procedural situations.

The first situation occurs where the bankruptcy court is asked to confirm a sale of the bankrupt's property. Secondly, the court is occasionally asked to set aside a sale that has previously been confirmed by that court. The third and most infrequent situation that arises with regard to the sale of estate property is where a reviewing court i.e., the district court or appellate court, is asked to determine that an appeal has been rendered moot because the sale has actually taken place and the purchaser was a "good faith purchaser" under the provisions of Federal Rule of Bankruptcy Procedure 805 in effect under the Act.

Unfortunately, there has been misuse of the term "setting aside" which has lent some difficulty to an accurate analysis of the relevant standards. This is probably a result of objections to a public sale of estate property being often referred to as an attempt to "set

aside" a sale when, in fact, these are actually objections to confirmation of a public sale.

■ An excellent analysis of the distinction between hearings on the confirmation of a sale and hearings to set aside a confirmed sale can be found in *4B Collier on Bankruptcy, (14th Ed.) ¶ 70.98, page 1180, et seq.* This confusion in analysis is also referenced in *6 Remington on Bankruptcy, § 2557, page 49, footnote 16.* See also *Reid v. King,* 157 F.2d 868, 870 (4th Cir.1946). Both treatises support the proposition that the confirmation of a proposed sale is much more within the discretion of the bankruptcy court than is the attempt to set aside a confirmed sale where more compelling circumstances of fraud, mistake, unfairness or defect must be met before a previously confirmed sale will be set aside.

The seminal case in this circuit on bankruptcy sales under the Bankruptcy Code of 1978 is *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3rd Cir.1986). This court concludes that the principles enunciated in *In Re Abbotts Dairies of Pennsylvania, Inc.* are equally applicable under the Bankruptcy Act of 1898 because those same principles were applied earlier in *In re Rock Industries Machinery Corp.,* 572 F.2d 1195 (7th Cir.1978). This conclusion leads to the identification of the third procedural situation where sales of property may be upset by a reviewing court. *In re Abbotts Dairies of Pennsylvania, Inc.* mandates that a bankruptcy court make a specific finding of good faith or the lack thereof, and that mandate appears to be required whether the sale is one under the Bankruptcy Code pursuant to Section 363(m) or the earlier Bankruptcy Act pursuant to Rule 805. The purpose of making that finding is not necessarily as a requirement in approving the sale but rather to determine whether a stay of the sale must be had in order that reversal of the sale or a modification of the sale order could be effective to alter the original approval.

As indicated earlier, our courts frequently interchange the terms "deny confirmation" and "setting a sale aside". Nevertheless, there is a significant difference between the two.

"*Confirmation* vests in the purchaser the full equitable title to the property sold;

the legal title thereafter is to be conveyed by the trustee pursuant to the confirmed sale. A grant or denial of confirmation or approval is, in the measure, the determination of a legal issue, since it involves an examination of the preliminaries to, and the conduct of, the sale. Yet it is also, and possibly to a larger extent, a matter of business administration and practical management. This element of business expediency necessarily determines the margin of judicial discretion when deciding whether or not a sale should be confirmed. Such discretion is also subject to certain general limitations that flow from the court's own previous conduct. Thus, it would ordinarily be arbitrary for a court to deny confirmation and order resale after property has been knocked down for a figure equal to or in excess of the appraised value to the highest bidder at a fairly conducted public auction sale. At any rate the pervading interests in enhancing public confidence in the stability and integrity of bankruptcy sales and in facilitating economic, efficient and expeditious bankruptcy administration would require an extraordinary showing to justify the refusal to confirm. The court undoubtedly retains a greater degree of supervisory control over the trustee's actions as a selling agent pending ultimate confirmation when it authorizes him to enter into negotiations for a private sale or to invite the submission of sealed bids for consideration and possible acceptance on a day designated. The restrictions imposed on the court's discretion to confirm or disapprove a sale are in any event judicially imposed, and the range of discretion remains wide, mainly due to the purely administrative element involved." [Citations omitted.] *4B Collier on Bankruptcy (14th Ed.), ¶ 70.98, page 1180–1182.*

The setting aside of a sale, on the other hand,

" . . . presupposes an otherwise complete sale—that is, normally, a sale that requires confirmation and has been duly and definitely confirmed. Its function is one of strictly equitable jurisdiction, namely to avoid a sale, public or private, that is tinged with fraud, error or similar defects

which would in equity affect the validity of any private transaction. Naturally, such defects would equally justify the denial of confirmation. But proceedings to 'set aside' a sale offer an opportunity to attack on the grounds mentioned a sale already finally confirmed unless the particular defect alleged was examined in the confirmation proceedings and was held to be without merit, in which case the principle of res judicata would apply. Proceedings to set aside cannot be set in motion for reasons other than defects of such gravity as to 'shock the conscience of the chancellor', and even irregularities of a quite serious kind that might have been, but were not, asserted in the confirmation proceedings are definitely lost and cannot be used as a ground for the request to set aside.

The distinction between proceedings to set aside and confirmation proceedings becomes particularly important when · it is asserted that the sales price is inadequate or that there were irregularities in the sales procedure. As noted in the preceding paragraph, irregularities that fall short of fundamental defects cannot be availed of as grounds for vacating a confirmed sale. Confirmation of a sale, on the other hand, may be denied for less serious reasons, i.e., if raised by persons with sufficient interest to have a standing to object, typically creditors or high bidders. Objections sufficient to defeat confirmation include unfairness toward bidders, stifling of competition, inaccurate or otherwise insufficient advertisement, sham bidding or 'puffing', lack of due notice and interference with the orderly conduct of the sale.

But the language of the courts is none too precise as to the degree of price inadequacy required to warrant denial of confirmation, on the one hand, and setting aside, on the other. 'Mere inadequacy', an expression that usually covers cases of a rather slight difference between the highest auction bid and either a supervening bid, or the appraised value, or an alleged fair market price, will not suffice even to warrant a refusal of confirmation, much less the setting aside of a confirmed sale. Nor is the fact that after a satisfaction of prior liens nothing will be left even for certain mortgagees a sufficient indication of inadequacy of price to warrant either a denial of confirmation or the setting aside of a sale. *Generally speaking, however, confirmation may be denied on the basis of inadequacy of price where there is a substantial disparity between the bid or contemplated sales price and the appraised or fair market value, and there is a reasonable degree of probability that a substantially better price will be obtained by a resale or there is some element, however slight, of unfairness on the part of the purchaser.* This cumulative result of the cases represents a compromise between the policy of strengthening public confidence in the stability of judicial sales and that of strengthening the court's hands in its efforts to secure the best possible result for the benefit of the estate under its protection. But when the court is faced with a request to set aside a sale and to undo what has already been done with the court's approval, the balance turns in favor of the policy of strengthening public confidence in judicial sales and executed contracts, and, as we have seen, the sale will be set aside only if the grounds alleged are sufficient to invalidate a similar private transaction on equitable grounds." [Citations omitted.] [Emphasis ours.] *4B Collier on Bankruptcy (14th Ed.), ¶ 70.98, page 1183–1193.*

In explaining the dichotomy between the confirmation of a sale and the setting aside of a sale, both *Collier on Bankruptcy* and *Remington on Bankruptcy* cite with approval the Second Circuit case of *In re Burr Mfg. & Supply Co.,* 217 F. 16, 133 C.C.A. 126 (2nd Cir.1914).[2]

The *Burr* Court supports the proposition that "*Before confirmation,* if the inadequacy of the price be great, slight circumstances of unfairness on the part of the party benefited will be sufficient to prevent confirmation, and will justify the opening of the sale for further

---

**2.** *4B Collier on Bankruptcy, (14th Ed.) ¶ 70.98, page 1194. 6 Remington on Bankruptcy, § 2557, page 49, footnote 16.*

bids.... The rule is settled, and it seems to be universally approved, that *after confirmation* of a judicial sale neither inadequacy of price, nor offers of better prices, nor anything but fraud, accident, mistake, or some other cause for which equity would avoid a like sale between private parties, will warrant a court in avoiding the confirmation of the sale, or in opening the latter and receiving subsequent bids." [Emphasis ours.] *Id.,* at page 21.

The *Burr* Court suggested that the inadequacy of consideration could be so great as "in itself to raise a presumption of fraud or to shock the conscience of the court." The instances cited by the *Burr* Court included examples when property was sold for six-tenths of a percent, two percent and fourteen percent of value as occasions when the inadequacy of consideration was so great as to justify the setting aside of a confirmed sale. The Court further suggested that one-half to one-third of actual value may be within this rule.

These distinctions between the confirmation of a sale, the setting aside of a confirmed sale, and the necessity of making a finding of good faith in order to prevent a post-sale appellate court modification of a confirmed sale having been generally discussed, we now turn to the applicable cases in our circuit which will guide this court under principles of stare decisis.[3]

We will begin our analysis by examining the statute itself which, of course, provides the authority by which the bankruptcy court reviews sales. Section 70f of the Bankruptcy Act of 1898 reads, in part, as follows: "... Real and personal property shall, when practicable, be sold subject to the approval of the court. It shall not be sold otherwise than subject to the approval of the court for less than 75 per centum of its appraised value...."

This section obviously evidences a preference by Congress that all bankruptcy sales under the Act be subject to confirmation by the bankruptcy court and, taking that one step further, *requires* that sales for less than 75 per centum of appraised valuation be brought before the court for specific approval.

It can also be assumed that authorized public sales of property for seventy-five percent (75%) or more of appraised valuation are sufficiently acceptable so as not to *require* confirmation if such is not practical. In other words, sales at seventy-five percent (75%) or more of appraised value are apparently presumed "adequate".

"... [I]f the price is below the 75% level, the burden is on the trustee or others seeking confirmation to show that, nevertheless, such price is not *grossly inadequate* and the sale should be approved, or that it would be an abuse of discretion not to confirm because no *substantially better* price could be obtained on a resale." [Citations omitted.] [Emphasis ours.] *6 Remington on Bankruptcy, § 2557, page 50.*

In *Jacobsohn v. Larkey,* 245 F. 538 (3rd Cir.1917), a bankruptcy referee refused to confirm a sale of property concluding that the consideration was grossly inadequate. In that case, an apparent bidding process took place at which time the trustee sold real estate and personalty separately for a total consideration of Twenty–Seven Thousand Five Hundred Dollars ($27,500.00). The creditors complained that the property could have been offered jointly for a much higher sum and that the appraisals of the property totalled Sixty–Five Thousand Five Hundred Sixty–Two and 20/100 Dollars ($65,562.20). Based on these considerations and the posting of a bond by the objecting bidder, the referee did not approve the sale but rather ordered another sale to take place. The district court affirmed the referee's Order.

Initially, the Third Circuit Court in *Jacobsohn* affirmed the proposition that judicial sales are not to be disturbed except for substantial cause, reasoning that "nothing will more certainly tend to discourage and prevent bidding than a judicial determination that the highest bidder may be deprived of

---

**3.** Decision of Court of Appeals is binding on all inferior courts in that circuit. *In re Taffi,* 144 B.R. 105 (Bkrtcy.C.D.Calif.1992).

the advantage of his accepted bid by an offer of another person, subsequently made, to bid higher on resale." *Id., at page 541.*

Nevertheless, the *Jacobsohn* Court recognized that the rights of successful bidders were not superior to the rights of creditors not to be deprived of their security at prices which are grossly inadequate. The Court indicated that the high bidder and the creditors are parties "with equal standing".

The Court then stated the issue as being "whether [the bankruptcy court] abused its discretion in setting aside the first sale on the ground that the bids were grossly inadequate." *Id., at page 541.*

The Circuit Court indicated that ... "The rule is that mere inadequacy of price is not a sufficient ground for setting aside a judicial sale; but when the inadequacy is so great as in itself to raise a presumption of fraud or to shock the conscience of the court, it becomes gross inadequacy, and is a sufficient ground." *Jacobsohn v. Larkey, supra, at page 541* citing *In re Burr,* 217 F. 16, 21, 133 C.C.A. 126 (2nd Cir.1914).

The sale in *Jacobsohn* was a sale "subject to confirmation" and the reviewing court was examining the justification of the bankruptcy referee in not confirming the sale. Notwithstanding that, the *Jacobsohn* Court adopted the rule set forth in *In Re Burr* which applies to those occasions when a sale already confirmed by the bankruptcy court can be set aside for cause.

Either intentionally or unintentionally, the circuit appears to adopt a position that in the absence of specific proof of fraud, etc., the inadequacy of consideration must be so great as to raise a presumption of fraud or shock the conscience of the court before it becomes gross inadequacy sufficient to refuse confirmation of a bankruptcy sale.

In *Jacobsohn*, the Court concluded that the referee was justified in declining to confirm the sale where the consideration was forty-two percent (42%) of appraised valuation and the objecting bidder gave a bond to insure that the second sale would bring more than the first sale.

In *In re Stanley Engineering Corp.*, 164 F.2d 316 (3rd Cir.1947) *cert. denied sub*

*nom., Root v. Galman,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948), again the Third Circuit was given an opportunity to review refusal by a bankruptcy court to confirm a judicial sale.

In that case, the appraisers valued the property at Fifty Thousand Dollars ($50,-000.00) and the public sale resulted in the highest bid of Fifty–Seven Thousand Two Hundred Fifty Dollars ($57,250.00). A contract of sale was entered into and the bid was presented to the bankruptcy court for confirmation. The bankruptcy court refused confirmation based on the presentation of a ten percent higher bid received from another party.

In reversing the bankruptcy court, the Third Circuit again enunciated; "... that judicial sales, made upon due notice and in accordance with law, will be confirmed unless (a) there was fraud, unfairness or mistake in the conduct of the sale; or (b) the price brought at the sale was so grossly inadequate as to shock the conscience of the court and raise a presumption of fraud, unfairness or mistake.... Where the bankruptcy court fails to confirm a judicial sale in the absence of unfairness, fraud or mistake or gross inadequacy of price, its action will be reversed on the ground of abuse of its legal discretion." *Id., at pages 318, 319.*

The Court further indicated that, "A purchaser at a judicial sale, who has complied with the terms thereof, or who shows his willingness and ability so to do, is not only entitled to the protection of the court, but as a party to the proceeding, made such by his purchase, is so situated as to be entitled to the court's decree of confirmation, in the absence of the inadequacy, fraud, or mistake before alluded to." *Id., at page 320 citing Sturgiss v. Corbin,* 141 F. 1 (4th Cir.1905).

If this is the standard that we are to apply to the facts in the case before us, we first must be convinced that a private bidder as is the Earth Conservancy has the same rights as a successful bidder at a public sale.

Is it possible that the standards enunciated in *Jacobsohn* and *Stanley Engineering Corp.* are such that they would be peculiar to a

public sale by the trustee of estate property as opposed to a private sale as we have here?

"The sale is just as much a 'judicial' one where this court simply approves an offer made as where it first orders sale and thereafter approves." *6 Remington on Bankruptcy, § 2547 at page 36.*

■ "Before confirmation a sale is not in a technical and legal sense a sale. Until confirmation an accepted bidder is merely a preferred proposer. But a confirmation has the effect of completing the sale, and while it does not pass the legal title it vests the full equitable title to the property in the purchaser, even though the deed executed in pursuance thereof is irregular, and even if no deed whatever is made." *In re Burr Mfg. & Supply Co., supra. at page 19.*

Apparently then, a public sale subject to confirmation and a private sale subject to confirmation both present similar situations where a purchaser "preferred" by the trustee is before the court for the purpose of confirming the sale i.e., effecting the passage of equitable title.

There is seemingly no difference in the application of the principles that we have enunciated, whether an individual is the highest bidder at a public sale or the proposed purchaser at a private sale. They both fit into the category of "preferred bidder waiting for the court to accept his offer". *6 Remington on Bankruptcy, § 2547, page 36.*

Does this mean that we must treat the approval of a private offer in the very same manner that we would consider the confirmation of a public sale? This court does not believe so.

■ Heretofore, we have cited *Collier on Bankruptcy* for the proposition that ". . . the pervading interests in enhancing public confidence in the stability and integrity of bankruptcy sales and in facilitating economic, efficient and expeditious bankruptcy administration would require an extraordinary showing to justify refusal to confirm." *4B Collier on Bankruptcy, Id., at page 1180–1182.* This statement obviously cautions the court to treat the results of a public sale with some deference. Nevertheless, *Collier on Bankruptcy* further indicates that "[t]he court un-

doubtedly retains a greater degree of supervisory control over the Trustee's actions as a selling agent pending ultimate confirmation when it authorizes him to enter into negotiations for a private sale or to invite the submission of sealed bids for consideration and possible acceptance on a day designated." *4B Collier on Bankruptcy, Id., at page 1181.* Accordingly, a larger measure of discretion is available to the court in considering whether a private bid should be approved or confirmed. Therefore, the court retains a greater degree of flexibility in reviewing a privately negotiated sale since the enhancement of "public confidence" in the public sale is no longer a factor for the court to consider in passing upon confirmation.

Based on the analysis that we have made of applicable principles, we conclude that the following points of law are the foundation upon which our decision must be based.

■ Mere inadequacy of price is not sufficient grounds for refusing to confirm a judicial sale absent evidence of unfairness. *In re Stanley Engineering Corp., supra..* If the inadequacy of price is great, slight circumstances of unfairness will be sufficient to prevent confirmation. *In re Stanley Engineering Corp., supra at 319 citing Ballentyne v. Smith,* 205 U.S. 285, 27 S.Ct. 527, 51 L.Ed. 803 (1907). Gross inadequacy of price is sufficient of itself to require denial of confirmation. *6 Remington on Bankruptcy, § 2557 at page 49.*

■ Our analysis leads to the conclusion that our Circuit would adopt the proposition enunciated in *4B Collier on Bankruptcy (14th Ed.),* ¶ *70.90, page 1192* that "confirmation may be denied on the basis of inadequacy of price where there is a substantial disparity between the bid or contemplated sales price and the appraised or fair market value, and there is a reasonable degree of probability that a substantially better price will be obtained by a resale or there is some element, however slight, of unfairness on the part of the purchaser."

To restate that proposition, if we find that there is great inadequacy of consideration and a reasonable degree of probability that a

substantially better price will be obtained by a resale, confirmation will be denied. Alternatively, if we find that there is a great inadequacy of consideration and some element of unfairness on the part of the purchaser, again we will choose to utilize our discretion and deny confirmation.

 We are convinced that confirmation of a sale of property involves concurrent considerations of the relative inadequacy of consideration, fairness of conduct or mistake, and the degree of probability that a substantially better price will be obtained by a resale. If the consideration is so grossly inadequate that it "shocks the conscience of the court" as in *In re Burr, supra,* then, of course, the court will presume there to be a reasonable probability that a substantially higher resale could be obtained and will deny confirmation despite the lack of any evidence of fraud, unfairness or mistake. On the other hand, if there is any degree of fraud, unfairness or mistake, then the bankruptcy court will assess the impact of these factors on the consideration at issue when that offer is compared to the court's finding of valuation. The greater the degree of unfairness, etc. found; the lesser the degree of inadequacy required to justify the refusal of confirmation.

 If this court should confirm a sale after considering these issues, then only gross inadequacy of consideration, or fraud, unfairness or mistake not theretofore considered, or fundamental defect in the procedures such as found in *Matter of Time Sales Finance Corp.,* 445 F.2d 385 (3rd Cir.1971), will allow this court to set aside the confirmed sale.[4]

 Should there be an appeal from the Order of this court, then no stay will be required in order for a reviewing court or this court to eventually fashion a corrective resolution unless we make a deliberate finding that the purchaser acted in good faith.

These principles will control our ultimate resolution of the case before us.

---

**4.** A motion to vacate an approved sale of debtor's assets is, in effect, a motion for relief from judgment, a denial of which is reviewed for abuse of discretion under Federal Rule of Civil Procedure

## DISCUSSION

 The Trustee has presented to the court an offer to purchase all of the assets of the above bankrupts for the effective sum of 14.6 million dollars. Initially, in April of 1992, the Trustee had agreed to a sale with the same party for 12.5 million dollars. *Transcript, January 27, 1994, page 34.* This agreement was made without the aid of an appraisal. When the Trustee realized that the purchaser could "pick and choose" the properties it wanted, the Trustee disclaimed the agreement and instructed his lawyer to renew negotiations. This time, the Trustee had the benefit of a January, 1993 appraisal prepared by Resource Technologies Corporation to guide him although, according to his testimony, it was of little influence. *Transcript, August 5, 1993, page 155.*

 In supporting the present agreement as in the best interest of creditors, the Trustee testified that by adding the consideration offered for this sale (14.6 million dollars) to the proceeds of an earlier sale to the Greater Wilkes–Barre Industrial Fund, Inc. (hereinafter "Sears Sale", a 332.7 acre parcel for 1.4 million dollars) and the liquidated damages received from buyers in the two earlier failed sales (One Million Eight Hundred Fifty Thousand dollars), the estate would have total receipts of almost 18 million dollars since 1989. This sum, the Trustee concluded, was equivalent to the net offer of G.A. Resources approved by the court in 1986 as well as the approved offer of Energy Recycling Group ("E.R.G.") in 1989. Since approval of the Earth Conservancy agreement would result in receipt of substantially the same net amount as would have been received by the Trustee if the earlier sales were closed, the Trustee determined that the offer was acceptable. *Transcript, August 4, 1993, page 178.*

This reasoning is fallacious. The market in 1986 and 1989 is not the same real estate or mineral market as exists in 1994. Moreover, the Trustee has no reason to rely on

60(b). *In re Summit Ventures, Inc.,* 161 B.R. 9 (D.Vt.1993). *See also In re Marcus Hook Development Park, Inc.,* 943 F.2d 261, 265 (3rd Cir. 1991).

earlier lost deposits as a measure of anything other than damages. This sale agreement must stand on its own merits compared only to this court's conclusion of present market value.

The penultimate duty of a bankruptcy Trustee under the Act of 1898 is specified in Section 47(a) of the Act which reads as follows under the heading "Duties of Trustee":

"Trustees shall (1) collect and reduce to money the property of the estates for which they are trustees, under the direction of the court, and close up the estates as expeditiously as is compatible with the best interests of the parties in interest."

This statutory directive from Congress obviously defines the road upon which we must embark with regard to this decision.

Just who are these "parties-in-interest" whose concerns must be considered by the bankruptcy Trustee?

"The trustee is the statutory representative of all the creditors, and he holds the assets of the estate in trust for their benefit. He represents all creditors, not only the majority, however great that may be.... In administering the estate, he cannot yield his judgment to that of the majority of the creditors merely because they are the majority, without breach of his trust.... He is duty bound to work in harmony with the creditors and follow their reasonable suggestions, but he is not subject to their dictation and should follow his own best judgment.

The trustee's office is one of personal confidence, and the duties imposed upon him are his and his alone. He cannot delegate his duties to others, and ultimately he is responsible for all actions taken during the administration of the estate which affect the interest of creditors. Moreover, he is responsible for actions not taken when they are called for." *11A Collier on Bankruptcy, 14th Ed., § 7.001[2], P–222.*

Collier further indicates that the Trustee also represents the bankrupt in certain respects since he succeeds to the interest of the bankrupt and, should there be a surplus, has a duty to return the surplus for the benefit of the bankrupt.

Moreover, "[w]hile he is not a trustee for a fully secured lien creditor, as custodian of all properties of the bankrupt, he may have a duty to mortgagees, lienholders or others who may be entitled to reclaim some of the properties which are in his custody. Thus, he is charged with the duty to preserve all properties which are in his actual or constructive possession, even though such properties may be encumbered, or not even owned by the bankrupt." *Id., at P–223.*

As heretofore indicated, it has not escaped this court that active unsecured creditors, to a person, were lined up against the Trustee in opposing the Trustee's Motion to sell property to the Earth Conservancy. Only the Anthracite Health and Welfare Fund, a lien creditor, supported the Trustee, which lien creditor will apparently be paid in full from the proceeds, subject, of course, to the ultimate allowance of that secured claim. Even though the position of the unsecured creditors is of significant concern to this court, it cannot control the disposition of the pending Motion.

The Trustee has a duty under Section 47a of the Act to reduce to money the property of the estate as expeditiously as is compatible with the interest of the parties.

The estate in 1994 has virtually the same assets that it possessed in 1976 and 1978 when these estates were created. *Transcript, August 5, 1993, page 41.*

No liquidations were initiated during the pendency of the litigation against the disputed mortgage holders. The delay in liquidation could have not been caused by the *Gleneagles* litigation since, historically, bankruptcy courts have approved sales of property free and clear of disputed liens.[5]

---

5. If a determination of the extent of an encumbrance "... would result in a delay detrimental to the best interests of the estate, it is proper for the bankruptcy court to order an immediate sale free of liens, provided there appears to be an equity in the estate for creditors if the lien should subsequently be found either not to be valid or not to extend to the property in question." *4B Collier on Bankruptcy, § 70, ¶ 70.97, page 1138.*

The liquidation efforts of the Trustee appear to have been concentrated in or about 1983 when various solicitations were made and advertisements placed in national publications. *Transcript, January 14, 1994, page 118* and *Exhibit P–21.* General notices of sale have accompanied each sale effort.

Apparently, during the tenure of the Trustee or his predecessors, no specific marketing plans for the assets of the estate were devised until after negotiations began with the Earth Conservancy in 1991.

While the court cannot find that the Trustee and his predecessors have *expeditiously* attempted to liquidate the property of the estate, this is not a factor in deciding whether this Motion should be approved or disapproved.

Mr. McDonnell spent four (4) days on the witness stand during which time he underwent an extensive grilling by various counsel for the objectors.

During that testimony, it became apparent that the Trustee was not a "hands-on" administrator. To some degree, this was understandable inasmuch as he succeeded to the Trusteeship vacated by his then law partner, James Haggerty, in 1987, and at that point, inherited a bankruptcy case that was in its eleventh year. It is not surprising that the Trustee relied a great deal on his counsel, since that firm had been involved with Blue Coal from the very inception of the case. Nevertheless, the Earth Conservancy's agreement was approved by the Trustee over Doran's objections for a consideration we find is equivalent to 14.6 million dollars.

To justify the sale, the Trustee called his expert, Jeffrey Kern of RTC, who testified that in his opinion all the assets of Blue Coal were worth the sum of 19.3 million dollars. *(1994 Appraisal). Transcript, January 14, 1994, page 247.*

Mr. Kern testified that his familiarity with the Blue Coal properties dated back to the mid 1970s when he, as a part of a government study, participated in a review of various subsidence in the area. In 1982, during the *Gleneagles* case, Mr. Kern was asked by the United States government to render opinions on general gross valuations of the Blue Coal assets as they were in 1976 and 1980. *Transcript, January 14, 1994, page 109. See Exhibit P–6.*

After the government's successful effort to strip the liens from the Blue Coal property, Mr. Kern was asked by the bankruptcy Trustee to create a "prospectus" of all Blue Coal properties which identified various parcels and evaluated same on an individual basis as if each was available for resale without reference to the fact that seventeen thousand (17,000) acres might be placed on the market at the same time. *Exhibit P–5.*

It was pursuant to the liquidation Motion filed by the government on November 18, 1992 that Mr. Kern was then asked to set a value on the Blue Coal properties and, after much investigation, he did, in fact, evaluate the property in January of 1993 for the total sum of 24.7 million dollars. *(1993 Appraisal). Exhibit P–4.*

In January of 1994, Mr. Kern adjusted his valuation to reflect a liquidation period of five (5) years and a discount rate of twelve percent (12%) to conclude that the then-current market value of the property was 19.3 million dollars. *(1994 Appraisal). Exhibit P–27.*

In another strange twist, the Trustee then set about discrediting his own expert's testimony by offering two (2) additional experts to testify that the liquidation period of five (5) years was much too short and the discount rate used by Mr. Kern was much too low thereby inferring that Mr. Kern's valuation was significantly overstated.

Moreover, the objectors, while not advancing appraisal testimony themselves, attacked Mr. Kern's credibility by suggesting that his liquidation period was too long and that he used inappropriate methods of discounting the present worth of coal and sand and gravel reserves. Further, the objectors claimed that Mr. Kern's estimation of value was significantly understated and much too conservative. The objectors also argued that the value of standing timber should not have been disregarded by Kern as a non-factor.

Just as this court was confounded by the lack of basic knowledge by the Trustee of the details of the property under his administration, the court was impressed with the grasp

that Jeffrey Kern, the Trustee's appraiser, had of each and every aspect of the Blue Coal properties. Mr. Kern recited in minute detail the various idiosyncrasies of localized parcels while at the same time retaining an impressive overview of the dynamics of the anthracite market. In short, to the extent that this court had reservations with regard to certain facets of Mr. Kern's appraisal, such as his double discounting of coal, culm and sand and gravel, we conclude that those reservations were insubstantial in light of Kern's expertise and detailed knowledge of the assets.

Mr. Kern's testimony withstood well against what turned out to be credibility attacks from all parties. The court was impressed with the research that was performed in undertaking this massive project, his candor in responding to questions, and the articulation with which he expressed his conclusions. He acknowledged his errors in the earlier appraisal of January, 1993, and he detailed how his 1994 appraisal reflected various adjustments that were made.

This court concludes that Mr. Kern's appraisal of 1994 should be adopted as the value of the assets in question.

When measured against Mr. Kern's appraisal of 19.3 million dollars, the Earth Conservancy offer amounted to 75.65 percent of the adopted value. As indicated in *In re Rock Industries Machinery Corp.*, 572 F.2d 1195 (7th Cir.1978) and again in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir.1986), the payment by a purchaser of seventy-five percent (75%) of appraised valuation has been held to be "fair and valuable consideration".

Because the appraisal was performed after the offer, the valuation by Mr. Kern had to be either coincidental or contrived as a result of some collusive discussion between one or more of the proponents of the sale and the appraiser in order to meet the "75%" threshold. Since we have hereby upheld the integrity of the appraiser, we will attribute the ultimate percentage as being a mere matter of coincidence.

At this juncture, the court must be absolutely frank with the parties. Eighteen (18) years have passed in this estate with only a nominal portion of the property being disposed. The decision to approve or disprove the sale will not turn on a few percentage points. Rather, this court will be guided by applicable legal principles as hereinbefore discussed.

Even accepting the objectors' argument that Kern's 1993 appraisal should be adopted as the value of these assets, the Earth Conservancy offer would still not be so inadequate that fraud, unfairness, or mistake could be presumed under the *In re Burr Mfg. & Supply Co., supra* case. *Transcript, January 26, 1994, page 22.*

The objectors' attack on the Motion to sell property does not allege fraud, mistake, or any procedural defect in the proceedings as was present in *Matter of Time Sales Finance Corp., supra*. The objectors appear to concentrate their argument on unfairness in the proceedings as may be otherwise identified as a lack of good faith. They rely on the following events to evidence that unfairness.

1. The Trustee has shown a lack of good faith by failing to abide by the letter of this court's Liquidation Order of January 12, 1993, which required him to liquidate individual parcels of property until such time as the court would suspend the Liquidation Order.

2. The Eleventh Congressional Regional Equipment Center ("REC"), a creation of local U.S. Congressman Paul Kanjorski, intentionally occupied lands of the estate without consideration.

3. The REC intentionally caused pollution of estate property thereby reducing the fair value of the assets proposed to be purchased by the Earth Conservancy, another creation of Congressman Kanjorski.

4. Congressman Kanjorski threatened to call the United States Environmental Protection Agency and notify them of various environmental problems if the Earth Conservancy was not the successful bidder, thereby reducing the interest that prospective purchasers may have in the property.

5. Congressman Kanjorski has exercised his "political influence" to sway the objectors in the presentation of their case so as to increase the chances that the

Earth Conservancy would be the successful bidder.

Even if this court were to find the existence of unfairness or bad faith, we still retain the discretion to approve the sale should the estate be so desperate for a buyer that a rejection of the offer would be devastating to the creditors. This was implicit in *In re Abbotts Dairies of Pennsylvania, Inc., supra,* which case suggested that a lack of good faith would enable a court to fashion such Order, "... to see that injustice or unfairness is not done in administration of the bankrupt estate." *In re Abbotts Dairies of Pennsylvania, Inc., supra,* citing *Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939). Blue Coal is not quite that desperate. Eighteen (18) years of administration belies the liquidation efforts of the Trustee and his predecessors. There were no liquidations for the first seven (7) years during the pendency of the *Gleneagles* litigation. Thereafter, there were two (2) failed sale attempts. There were no significant marketing strategies until January of 1993. There was no detailed appraisal of the properties until 1993. There was no real piecemeal offering until May of 1993. In short, the court is not convinced that if this sale is lost, the estate property cannot be marketed effectively. Accordingly, if this court finds any material unfairness or bad faith in the mechanics of the sale, it will reject the sale.

Initially, the Trustee challenges the argument that the good faith of the Trustee is a factor citing *In re Abbotts Dairies of Pennsylvania, Inc., supra* for the proposition that it is the good faith of the purchaser, not the Trustee, that bears on the propriety of the sale request. Notwithstanding *In re Abbotts Dairies of Pennsylvania, Inc., supra,* our analysis of the law under the Act leads us to conclude that misconduct of the Trustee is sufficient ground for refusing confirmation. *6 Remington on Bankruptcy, § 2558, page 51.*

Accordingly, this court will first consider that portion of the Liquidation Order of January 12, 1993, which the objectors allege has been ignored by the Trustee.

Specifically, the Order provides as follows:

"4. The Trustee shall proceed promptly with the liquidation of discrete parcels for which bona fide offers are received from the public....

11. Nothing in this Order shall preclude the Trustee from entertaining a bulk sale from a purchaser who has sufficient resources to buy the property for an amount which is consistent with the appraised value of the assets of the Estate, provided, however, that in the absence of further order of this Court, the other provisions of this Order shall not be suspended pending negotiation."

The Trustee did, in fact, proceed with liquidation of discrete parcels and continued to sign agreements to that effect through March 31, 1993. *Transcript, August 9, 1993, page 62.* It was about that time that the Trustee notified his counsel he would no longer execute agreements pending further negotiations with the Earth Conservancy. The Trustee set an internal deadline of May 15, 1993 to enter into an agreement with Earth Conservancy or reinstitute piecemeal liquidation. *Transcript, August 9, 1993, page 72.*

The objectors argue that the cessation of piecemeal liquidation efforts was contemptuous by the Trustee and evidences "bad faith" which should defeat the sale request.

As the court was to find during the sale hearing, the Trustee, and his then counsel, John Doran, had a crisis of confidence during this period which appeared to foster a relationship that would breed miscommunication and misunderstanding. Obviously, the Trustee desired to suspend piecemeal liquidation pending negotiations with the Earth Conservancy. Obviously, counsel for the Trustee had reason to "... immediately notify the court and all creditors and parties in interest and request that a hearing be convened to seek modification of the terms [of the agreement]." *Liquidation Order filed January 12, 1993, paragraph 10.* Nevertheless, it was not until July 9, 1993, that a

request to suspend the Liquidation Order was filed by Trustee's counsel.

Since the Liquidation Order anticipated future alterations of the Order and since it was the desire of the Trustee to, in fact, alter the Order, the failure of Trustee's counsel to move immediately to suspend compliance with the Order will not be interpreted as an event of "bad faith" by the Trustee.

The Trustee argues that the occupation of and the activities on the Blue Coal property by the Eleventh Congressional Regional Equipment Center have nothing to do with the Earth Conservancy. The Trustee suggests that these are separate and distinct corporations whose activities should not be imputed to each other.

The record reflects Joseph Yudichak is a principal in both entities, as is Peter Kanjorski, the brother of the Congressman. The record further indicates that both Earth Conservancy and REC were inspired by United States Congressman, Paul Kanjorski, who retained some degree of influence with regard to their operations. A clear example of this influence was the disclosure by Mr. McDonnell that a telephone call from Congressman Kanjorski resulted in the Trustee contacting his counsel, John Doran, on or about April 15, 1993, instructing him not to file an injunction action against REC which would attempt to restrain REC from polluting estate property. *Transcript, August 9, 1993, page 38 and Exhibit US–22.*

Furthermore, admitted into evidence was Congressman Kanjorski's testimony at the November, 1992 hearing with regard to the United States' Motion to compel liquidation. *Transcript, January 27, 1994, page 65.* That testimony clearly indicates that the Congressman was a driving force behind the creation of Earth Conservancy and its efforts to secure funds for the ultimate purchase of Blue Coal assets.

It would be naive for us to consider that an individual of such powerful position would not provide the nexus so as to consider the activities of one organization equivalent to the activities of the other. It is, therefore, this court's conclusion that for the purposes of discussing the good faith of the proposed

purchaser and the Trustee at this hearing alone, Earth Conservancy will be accountable for the activities of REC.

The evidence is undisputed that the REC intentionally subjected the property of the estate to oil spills and the improper burial of waste in violation of state regulations on the disposal of various matter. The testimony of Matthew H. Kenealy, III, senior hydrogeologist with an environmental consulting firm, succinctly noted that the depth of the oil and the quantity of that oil on the premises could lead one to the conclusion that the pollution was of recent origin. *Transcript, January 26, 1994, page 46.* Mr. Kenealy concluded that such deposits were not merely accidental. *Transcript, January 26, 1994, page 45.*

Notwithstanding that testimony, Mr. Kenealy emphasized that these types of spills were no different than could be found in the ordinary salvage yard. *Transcript, January 26, 1994, page 55.* This court concludes that the inappropriate disposal of this matter may have been willful, but there is no evidence that such disposal was performed with the intention to depress the value of the property. Moreover, Mr. Kern's appraisal assumes that REC would arrange for its own solutions to the problem and not burden the bankrupt estate. *Transcript, January 15, 1994, page 99.* The Kern appraisal was not diminished by this environmental problem.

It is also a matter of record that the REC has independently made an offer to purchase the land which it occupies without material alteration of the Earth Conservancy offer for the remaining assets. The court cannot find that this activity by REC destroys the good faith of the transaction or represents unfairness by the parties.

The objectors further allege that the REC occupation of the land without lease and without compensating the Trustee is evidence of bad faith.

The evidence indicates that the REC went into occupation of the land with the consent of Trustee's counsel but without knowledge of the Trustee. *Transcript, August 5, 1993, page 109.* It continues to occupy the land without objection by the Trustee as an apparent accommodation to the proposed pur-

chaser (Earth Conservancy) and a possible buyer (REC). It is impossible for this court to read anything more into that occupation than the fact that it is an example of bad judgment that was made by the Trustee and his counsel.

Also identified as an indication of bad faith is the "threat" made by Congressman Kanjorski that if Earth Conservancy was not the successful bidder, the Congressman would request that the Environmental Protection Agency ("E.P.A.") do a review of all Blue Coal assets. *Transcript, Nov. 16, 1992, page 204, stipulated into the record at Transcript, January 27, 1994, page 65.*

The court acknowledges that the threat of an environmental audit is a significant discouragement to other interested buyers and would certainly depress the potential market for Blue Coal assets. *Kern Deposition of July 22, 1993 entered into the record at Transcript, January 27, 1994, page 120, et seq.* Whether this threat and its impact on future marketability constitutes bad faith depends specifically on the nature of the threat.

In this case, the fear was that the environmental police would inspect the property and find it deficient thus causing the estate and/or others to suffer significant financial detriment. While the tattletale may be treated poorly by society generally, the opposite is true with the judiciary for our doors should always be open to relevant and material evidence. Environmental problems relative to the Blue Coal properties are not only relevant and material, they are a legitimate concern of the Trustee. *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). This could result in an administrative expense that would decrease the distribution to creditors as would

any other administrative charge. This does not mean the estate has any less of an obligation to address its impact or that the Trustee does not have a duty to ascertain whether all administrative expenses are addressed. We will not identify a threat to call the E.P.A. as an indication of bad faith because the judiciary generally, and this court specifically, will not discourage any individual from contacting proper authorities regarding the administration of a bankruptcy estate.

Lastly, we turn to the topic of "political pressure".

The discharged counsel to the Trustee, Doran & Nowalis, in their briefs filed December 23, 1993 and January 19, 1994, alluded to the existence of "political pressure" on the Trustee and the objectors to advance the sale and discourage attacks on Earth Conservancy and the Congressman.

Regardless of the merits or demerits of using one's political clout, the fact remains that one's evaluation of the use of that clout oftentimes depends on whose "ox is being gored". An example of the use of political power is found in the record when a reference was made by appraiser Kern to the talents of former area Congressman Daniel Flood in securing certain coal contracts in the 1960s which resulted in a de facto price support for the market value of anthracite coal for the district, apparently benefitting Pennsylvania's northeast region. *Transcript, January 14, 1994, page 121.*

Obviously, this court is not required to adjudicate the general merits of such a process. Nevertheless, this court will unequivocally condemn any effort to politically strongarm the participants in a judicial hearing. This court will matter-of-factly indicate that if such strongarm tactics are found to exist, we will reject the sale.[6]

---

**6.** The Kern deposition of July 22, 1993 was admitted into evidence under Federal Rule of Evidence 703 to show that expert's state of mind in adjusting the 1993 appraisal in preparation for the 1994 appraisal.

Particularly troubling was his contact with two individuals (Novakowski and Damiano) who suggested that Congressman Kanjorski has pressured their groups not to "bother" bidding against Earth Conservancy.

Rule 703 allows us to consider these statements as proof that they were considered by

Kern. Our confidence in Kern's credibility convinces us that they were, in fact, *statements made* by Novakowski and Damiano. What this court is not allowed to do is consider that these statements represent *proof* that Novakowski and Damiano were indeed pressured by Kanjorski. They have not been placed under oath or been subjected to cross examination. What is more telling is that they have not been subpoenaed to present testimony despite the objectors' aware-

Attorney Doran's allegations immediately required us to inquire of the participants as to what pressure, if any, was placed on them with regard to the presentation of their case. The United States of America disavowed any exercise of political pressure on the presentation of their case, as did the Luzerne County Tax Claim Bureau, and the State of New York. *Transcript, January 24, 1994, pages 171–175. Transcript, January 27, 1994, pages 162–178.*

The Commonwealth of Pennsylvania exercised its attorney-client privilege but not without a lengthy statement that it supported the goals of the Earth Conservancy and wanted the issues resolved on legal principles of adequacy of consideration. *Transcript, January 26, 1994, pages 10–16.*

Of course, the court was gently reminded by Attorney Alan Harris on behalf of the Commonwealth that Congressman Kanjorski had "discussed the matter with the Governor of the Commonwealth of Pennsylvania". *Transcript, January 26, 1994, page 16.* As earlier noted in the transcript, Governor Casey is the former law partner of Trustee McDonnell. *Transcript, August 9, 1993, page 166.*

Gentle reminders are no substitute for evidence that might exist, direct or circumstantial, that political influence played a role in this matter. The record is devoid of any evidence that either the movant or the objectors altered their presentations because of political pressure.

To the contrary, the record is replete with evidence that this sale motion has been one of the most bitterly contested proceedings to have ever occurred in the Wilkes–Barre Division of this bankruptcy court. Since the motion was filed on June 22, 1993, ten (10) days of testimony have been taken over the course of six (6) months. Recusal motions

have been made by both movant and objectors. The Trustee has fired his lawyer who then attempted to file his own objections to the sale. No less than six (6) experts offered evidence. The Trustee was on the stand for four (4) days. Communications between the Trustee, his former attorney, and the Earth Conservancy have been subject to review and much of that has been admitted into evidence. If someone has "rolled over" on the pending motion, it is certainly not apparent from a review of the record.

The objectors were given every opportunity to demonstrate the existence of bad faith or unfairness in the transaction. While they have exhibited tenacity in their approach and identified individual failings, what has been established is not equivalent to the unfairness demonstrated by *Blanke Mfg. & Supply Co. v. Craig, et al.,* 287 F. 345 (8th Cir.1923) (bidding subject to reduction for reasons beyond control of other bidders); *In re Lake Champlain Pulp & Paper Corp.,* 20 F.2d 425 (N.D.N.Y.1927) (misconduct of the trustee); *In re Irvine,* 255 F. 168 (W.D.S.C.1919) (inadequate description and information for bidders); *and In re Ethier,* 118 F. 107 (E.D.Wis.1902) (bidder agent for another bidder) or the bad faith exhibited by *Wolverton v. Shell Oil Co.,* 442 F.2d 666 (9th Cir.1971) (sale without notice); *In re Stroud Ford,* 163 B.R. 730 (Bkrtcy.M.D.Pa.1993) (proposed purchaser paid competing bidder to withdraw objection); *and In re Sovereign Estates, Ltd.,* 104 B.R. 702 (Bkrtcy.E.D.Pa.1989) (perks to non-debtor insiders).

In the absence of a finding of bad faith, we conclude that the agreement between the Trustee and Earth Conservancy was made in good faith.

We further find that the offer of 14.6 million dollars, although below the appraised value, represents an adequate consideration which could not be rejected by this court

---

ness of their potentially damaging testimony since July of 1993.

Of course, Trustee's former attorney Doran would suggest that the objectors have been "politically" influenced by Earth Conservancy and Congressman Kanjorski and, therefore, would not call these individuals to testify. If that is true, though, why weren't these two individuals on Doran's list of witnesses that he sought court permission to call? *Brief in Support of the Motion of Doran & Nowalis for an Order of Court*

*Allowing Doran & Nowalis to Present Testimony of Jeffrey Kern and Other Witnesses on the Issue of Good Faith (filed Jan. 19, 1994) In Re Blue Coal Corp. (76–1311) (78–604).*

The court cannot speculate what these witnesses would say under oath. Since these allegations are hearsay statements which under the Federal Rules of Evidence cannot be relied on for the truth of the matter stated, the court cannot consider these allegations as evidence.

without interfering with the "broad margin of discretion and initiative" reserved to the Trustee as an officer of the court. "The bankruptcy courts have consistently respected the importance of the Trustee's managerial function and have abstained from any interference that would not seem indispensable for the purpose of safeguarding the interest of parties concerned, such as creditors, and bidders ..." *4B Collier on Bankruptcy, 14th Ed.,* ¶ *70.97, page 1130.*

In the final analysis, the court's decision turns on three factors. First, the age of the estate and the limited success the estate has had in liquidating its assets. Secondly, the unanimous opinion of three (3) experts that the Earth Conservancy's offer is a reasonable one.[7] Third, but no less critical, the lack of any credible evidence, direct or circumstantial, that political pressure or any other type of bad faith or unfairness has played any significant role in the formulation of the agreement or the conduct of the parties in supporting or opposing the Trustee's motion to sell.

Based on this analysis, this court will approve the Motion of the Trustee and authorize the execution of the agreement of sale with the Earth Conservancy by the bankruptcy Trustee.

In deference to the substantial impact this decision has on the estate, the court hereby grants the request of the United States that the Order approving the sale be stayed for a period of ten (10) days or the disposition of a request for stay pending appeal, whichever first occurs, in order to allow any aggrieved party the opportunity to revisit the issues raised here before another tribunal.

Our Order follows.

### ORDER

For the reasons set forth in the attached Opinion, IT IS HEREBY

**ORDERED** that the Application for Approval of Contract of Sale between Frank J. McDonnell, Trustee in Bankruptcy for Blue Coal Corporation and Glen Nan, Inc., and the Earth Conservancy filed on June 16, 1993 is hereby approved and, **IT IS FURTHER**

**ORDERED** that the Trustee's Motion to Sell Property Free and Clear of Liens, Claims and Encumbrances filed on June 21, 1993 is hereby granted.

The court further grants the request of the United States that the Order approving the sale be stayed for a period of ten (10) days or the disposition of a request for stay pending appeal, whichever first occurs.

**7.** Jeffrey Kern *Transcript, January 14, 1994, page 248.*
Joseph Wilk *Transcript, January 15, 1994, page 250.*
Arnold Tesh *Transcript, January 17, 1994, page 172.* The objectors argue that Tesh, despite his ample qualifications, should not be qualified as an expert since he did not possess a valid license under the Pennsylvania Real Estate Licensing and Registration Act, which makes it unlawful to appraise real estate without such

license. *63 P.S. § 455.301.* Since real estate licensing acts are intended to protect consumers in the residential housing market and not businessmen, (*Gruber v. Owens–Illinois, Inc.,* 899 F.2d 1366 (3rd Cir.1990)), and since this court is advised to interpret Federal Rule of Evidence 702 liberally, (*Gentle v. Resolution Trust Corp.,* 937 F.2d 899 (3rd Cir.1991)), the objection to Tesh's testimony will be overruled. See also *In re Southern Industrial Banking,* 71 B.R. 351 (Bkrtcy.E.D.Tenn.1987) at footnote 24.